Lawrence A. McLERNON, Appellant,

v.

DYNEGY, INC., Appellee.

No. 14–09–00312–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 26, 2011.

Daryl L. Moore, Houston, for appellant.

Douglas D. D'Arche, Dennis G. Herlong, Houston, for appellee.

Panel consists of Justices SEYMORE, BROWN, and BOYCE.

## OPINION

CHARLES W. SEYMORE, Justice.

Appellant, Lawrence A. McLernon, appeals a summary judgment in favor of appellee, Dynegy, Inc., in its suit to recover $2,645,807.60 allegedly due under a promissory note and on McLernon's coun-

terclaims for fraud. In a threshold issue, McLernon contends the judgment is not final because the trial court failed to order recovery of an ascertainable amount. Then, in four issues, he contends the trial court erred by granting Dynegy's motion for summary judgment and denying his cross motion. We affirm summary judgment in favor of Dynegy but modify the judgment to order that Dynegy have and recover from McLernon $1,881,716.85 in principal and interest, costs of court, and post-judgment interest on the total judgment at 5% per annum.

## I. BACKGROUND

In September 2000, McLernon began employment with Dynegy as an Executive Vice–President and signed a four-year employment agreement. During his employment, McLernon participated in Dynegy's "Short–Term Executive Stock Purchase Loan Program." Specifically, in October 2001, he purchased 40,000 shares of Dynegy stock at a total cost of $1,595,456.57 and executed a promissory note in this amount payable over a period of two years to "Dynegy Administrative Services Company" ("DASC"), a subsidiary whom Dynegy designated as payee so that it could serve as collection agent.

In his summary-judgment affidavit, McLernon averred that he decided to participate in the program after Dynegy's Chairman/CEO touted the company's financial forecast to encourage officer participation. According to McLernon, he later discovered that (1) Dynegy used the program as a ploy to "prop up" its stock value to the investing public by demonstrating that even officers were eager to purchase the stock, and (2) before McLernon's purchase, Dynegy had implemented "Project Alpha," a complex scheme through which Dynegy falsified its books to artificially inflate its financial strength and stock price. McLernon further asserted that the stock price plummeted in early 2002 when Project Alpha was publicly exposed and the Securities Exchange Commission launched an investigation, and he lost the majority of his investment. Project Alpha became the subject of a federal class action against Dynegy, which it eventually settled.

McLernon's employment was terminated on September 16, 2002. In conjunction with the termination, McLernon and Dynegy executed a "Settlement Agreement and Release" ("the severance agreement"), which included the following provisions: (1) Dynegy agreed to pay McLernon $2,392,000, plus $161,771.99 representing the value of benefits to which he would have been entitled through the end of the contractual employment term; (2) Dynegy agreed to continue McLernon's group health insurance benefits for thirty-six months with premiums to be paid by McLernon but at the rate applicable to active employees; (3) McLernon agreed to pay the balance of his loan over a five-year period and contemporaneously execute a new note; (4) he released certain claims against Dynegy; and (5) he disclaimed reliance on certain representations by Dynegy. McLernon contemporaneously executed a promissory note ("the note") for $1,608,570 plus interest, payable to DASC over a five-year period, which replaced the original note. DASC eventually assigned the note to Dynegy.

In his summary-judgment affidavit, McLernon averred that, before execution of the severance agreement and the note, Dynegy's then Chairman, Daniel Dienstbier, informed McLernon that Dynegy was requiring all executives to repay their stock-purchase loans in full but would adjust McLernon's loan if it forgave other executives' loans. According to McLernon, after executing these instruments, he

discovered that Dienstbier's representations were untrue because Dynegy had already forgiven all or significant amounts owed by some other executives. McLernon claimed he would not have executed these instruments if he had known this information.

In 2004, Dynegy sued McLernon, alleging he had failed to pay all amounts owed under the note. McLernon filed counterclaims, alleging fraud and seeking a declaratory judgment that the note was unenforceable, rescission of the note and the severance agreement, punitive damages, and attorneys' fees. The parties eventually filed cross motions for traditional summary judgment.

In McLernon's motion, he contended that Dynegy's suit was conclusively barred by several affirmative defenses which he had raised in his pleadings. On February 15, 2007, the trial court signed an order denying McLernon's motion.

Pertinent to this appeal, Dynegy presented its request for summary judgment in three separate motions.[1]

First, Dynegy filed a "Motion For Partial Summary Judgment" on June 26, 2006, seeking to recover $764,090.75 in outstanding principal and interest due on the note as of June 15, 2006, but reserving the right to later seek amounts that became due after June 15, 2006. In response, McLernon raised several additional affirmative defenses asserted in his pleadings. In the motion, Dynegy also sought summary judgment on McLernon's counterclaims based on Dynegy's own affirmative defenses. On March 13, 2007, the trial court signed an order granting this motion and ruling that (1) McLernon "is liable for the amount of $764,090.75 in outstanding principal and interest as of June 15, 2006," (2) the order did not address principal, interest, or fees on the note due after June 15, 2006, and (3) McLernon's counterclaims "addressed in the motion" were dismissed with prejudice.[2]

Next, Dynegy filed a "Motion For Final Summary Judgment" on August 4, 2008, relying on the same legal issues in the previous motion but alleging the note had now matured and seeking to recover an additional $1,881,716.85 in principal and interest that purportedly became due after June 15, 2006. On August 27, 2008, the trial court signed another order granting "partial" summary judgment in Dynegy's favor, ruling that it "have and recover judgment" against McLernon for $1,881,716.85 in principal and interest, costs of court, and post-judgment interest on the total judgment at 5% per annum, but also ruling that affirmative defenses remained pending.

Dynegy filed another "Motion For Final Summary Judgment" on December 12, 2008. Dynegy referenced a status conference a few days earlier at which the trial court remarked that the only pending issues were some of McLernon's counter-

---

1. The record indicates that, before Dynegy filed the three motions at issue on appeal, it had twice previously moved for summary judgment: the trial court granted a motion filed in 2004 but subsequently granted a new trial, and another motion filed in 2005 was continued for further discovery. However, in his brief, McLernon references the motions at issue on appeal and the previous 2005 motion. Nonetheless, the motions were substantially similar with respect to issues on which McLernon cites the 2005 motion; therefore,

we will construe all of McLernon's appellate complaints as directed at the motions at issue regardless of his occasional references to the 2005 motion.

2. The court also stated that Dynegy was entitled to its reasonable attorneys' fees in an amount to be determined later. However, attorneys' fees were not ultimately awarded in the final judgment.

claims. In the motion, Dynegy argued that the previous orders granting recovery on the note necessarily disposed of all counterclaims. On January 8, 2009, the court signed another order granting summary judgment in Dynegy's favor on McLernon's counterclaims and ruling that the judgment was final.

## II. PRELIMINARY ISSUE REGARDING THE JUDGMENT

■ As a threshold issue, McLernon contends the trial court did not sign a final judgment. Before briefing was due, we denied McLernon's motion to abate the appeal on this ground, but he raises the finality issue again in his brief. In particular, he contends that the January 8, 2009 order (the last of the three orders) did not constitute a final judgment despite the trial court's recitation therein because it contained no language ordering recovery of an ascertainable amount. Dynegy responds that all three orders together reflect the trial court ordered a total recovery of $2,645,807.60 as requested in Dynegy's motions.

We disagree with McLernon that the lack of a sum certain specified in the last order would preclude it from constituting a final judgment. Instead, to the extent that the two previous interlocutory orders contained language ordering recovery of a sum certain, they would merge into the January 8, 2009 order to constitute a final, appealable judgment. *See Webb v. Jorns*, 488 S.W.2d 407, 409 (Tex.1972) (recognizing interlocutory judgment becomes final when it merges into final judgment disposing of whole case); *see also Hyundai Motor Co. v. Alvarado*, 892 S.W.2d 853, 855 (Tex.1995) (per curiam) (stating that partial summary judgment becomes final upon disposition of other issues in the case).

■ However, we disagree with Dynegy that the trial court clearly ordered a total recovery of $2,645,807.60 even when all three orders are construed together. In the first order, the court generally stated that McLernon *"is liable for* the amount of $764,090.75 in outstanding principal and interest as of June 15, 2006" but did not specifically order recovery of this amount and stated the order did not address amounts accruing after that date. (emphasis added). However, in the second order, the court employed more definite language of recovery, ordering that Dynegy *"have and recover judgment* from and against [McLernon]" for $1,881,716.85, plus costs and post-judgment interest. (emphasis added). Thus, the court's use of the phrase "is liable for" in the first order stands in contrast to its use of the phrase "have and recover judgment" in the second order. As we will discuss, Dynegy established at most its right to recover $1,881,716.85. Therefore, the court may have intended for the $764,090.75 to be subsumed within the $1,881,716.85, consistent with the summary-judgment evidence. On the other hand, the court may have intended to order recovery of $2,645,807.60 because it expressly "granted" each motion for summary judgment and Dynegy requested a total recovery of this amount in the motions.[3]

Nevertheless, because Dynegy conclusively proved, at most, its right to recover $1,881,716.85, we need not ascertain the full amount of recovery intended by the

---

3. Dynegy asserts the judgment was sufficiently definite for the district clerk to issue a writ of execution and an abstract of judgment for $2,645,807.60. However, the record reflects that the clerk originally issued these instruments for $1,881,716.85 and Dynegy's counsel then requested a correction. Accordingly, even the district clerk originally construed the judgment as ordering recovery of only $1,881,716.85. Regardless, the clerk's construction does not control our interpretation of the judgment.

trial court. Instead, after disposing of all other summary-judgment issues, we will modify the judgment to order that Dynegy recover $1,881,716.85 in principal and interest, costs and post-judgment interest. If the trial court intended to order recovery of $2,645,807.60, then we are modifying the amount of recovery; but if the trial court intended to order recovery of $1,881,716.85, then our modification is merely a clarification to ensure the award of principal and interest is limited to that amount.

### III. ISSUES AND GENERAL STANDARD OF REVIEW

In his first three issues, McLernon challenges denial of his motion for summary judgment, contending he established Dynegy's claims were barred as a matter of law. Alternatively, in his fourth issue, McLernon challenges the grant of Dynegy's motion for summary judgment, arguing it failed to prove entitlement to summary judgment even if its claims are not barred as a matter of law.

■ Under the general standard applicable to both motions, a party moving for traditional summary judgment must establish there is no genuine issue of material fact and he is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex.2003). If the movant establishes his right to summary judgment, the burden shifts to the nonmovant to raise a genuine issue of material fact. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995). When, as in this case, both parties move for summary judgment and the trial court grants one motion and denies the other, we must review both parties' summary-judgment evidence, determine all issues presented, and render the judgment that the trial court should have rendered. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex.2000). We review a summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). We take all evidence favorable to the nonmovant as true and indulge every reasonable inference and resolve any doubts in his favor. *Id.*

### IV. DYNEGY'S MOTION FOR SUMMARY JUDGMENT

■ We will first discuss McLernon's challenge to the grant of Dynegy's motion for summary judgment.[4] A plaintiff seeking summary-judgment on its claim when, as in this case, the defendant has asserted counterclaims must conclusively prove all elements of its claim and prove entitlement to summary judgment on the counterclaims. *Tello v. Bank One, N.A.*, 218 S.W.3d 109, 113 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (citing *First State Bank of Athens, Mabank Branch v. Purina AG Capitol Corp.*, 113 S.W.3d 1, 4 (Tex.App.-Tyler 1999, no pet.); *Rush v. Barrios*, 56 S.W.3d 88, 97 (Tex.App.-Houston [14th Dist.] 2001, pet. denied)). To prove entitlement to summary judgment on a counterclaim, the plaintiff must conclusively negate at least one element of the counterclaim or plead and conclusively establish each element of an affirmative defense to the counterclaim. *Centeq Realty, Inc.*, 899 S.W.2d at 197.

■ If the defendant wishes to assert an affirmative defense to defeat summary

---

4. We recognize that McLernon would be entitled to rendition of judgment in his favor if he prevailed on his own motion by proving Dynegy's claims were barred as a matter of law, whereas he would be entitled to remand, at most, if the trial court erred only by granting Dynegy's motion. However, we first discuss Dynegy's motion because some sub-issues relative to disposition thereof are also pertinent to disposition of McLernon's motion.

judgment on the plaintiff's claim, he must urge the defense in his response and present sufficient evidence to create a fact issue on each element. *See Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell,* 193 S.W.3d 87, 95 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) (citing *Beathard Joint Venture v. W. Houston Airport Corp.,* 72 S.W.3d 426, 434 (Tex.App.-Texarkana 2002, no pet.); *Jones v. Tex. Pac. Indem. Co.,* 853 S.W.2d 791, 795 (Tex.App.-Dallas 1993, no writ)).

Relative to Dynegy's motion, McLernon contends (1) Dynegy failed to prove all elements of its claim, (2) it did not establish entitlement to summary judgment on McLernon's counterclaims, and (3) he raised a fact issue on certain affirmative defenses.

## A. Summary–Judgment Proof on Elements of Dynegy's Claim

■ To collect on a promissory note, the plaintiff must establish (1) there is a note, (2) the plaintiff is legal owner and holder, (3) the defendant is the maker, and (4) a certain balance is "due and owing." *Blankenship v. Robins,* 899 S.W.2d 236, 238 (Tex.App.-Houston [14th Dist.] 1994, no writ) (citing *Edlund v. Bounds,* 842 S.W.2d 719, 724 (Tex.App.-Dallas 1992, writ denied); *Resolution Trust Corp. v. Thurlow,* 820 S.W.2d 51, 52 (Tex.App.-San Antonio 1991, no writ)). McLernon argues that Dynegy failed to establish the amount due and owing on the note and that it was owner and holder.

### 1. Amount Due and Owing

■ To a certain extent, we agree with McLernon's initial assertion that Dynegy failed to establish the amount due and owing on the note. In particular, Dynegy did not prove that the total amount requested in its motions for summary judgment—$2,645,807.60 ($764,090.75 plus $1,881,716.85)—was due and owing.

To support its first motion seeking $764,090.75 due as of June 15, 2006, Dynegy presented the affidavit of Norelle Lundy, an Assistant Treasurer of both DASC and Dynegy. Lundy averred that "after allowing all lawful offsets, payments and credits, the outstanding balance due and owing as of *June 15, 2006 is $764,090.75*" (emphasis in original). In support, Lundy attached a "Statement of Payments due" summarizing principal payments required, payments made, principal in default, and unpaid interest for the referenced period. The document reflected that, based on these calculations, $764,090.75 was the amount required "to bring payments current with the amortization schedule."

To support its second motion seeking the amount that purportedly became due after June 15, 2006, Dynegy presented the affidavit of Anne Psencik, its Director of Finance, who swore in pertinent part:

All principal and interest under the Promissory Note became due on September 15, 2007. McLernon has failed to make payments required by the Promissory Note, and after allowing all lawful offsets, payments and credits, the outstanding balance due and owing on the Promissory Note as of July 31, 2008 [the day before execution of her affidavit] is $1,881,716.85.

Contrary to Dynegy's contention, Psencik did not aver that $1,881,716.85 was outstanding *in addition* to the $764,090.75 referenced in Lundy's affidavit. Further, Psencik did not limit the referenced balance of $1,881,716.85 to the period between June 16, 2006 and execution of her affidavit. Rather, she clearly averred that $1,881,716.85 was the total amount outstanding.

Moreover, our interpretation of Psencik's affidavit is consistent with her sup-

porting documentation. She also attached a "Statement of Payments due," summarizing principal payments required, payments made, principal in default, and unpaid interest for October 15, 2002 through September 15, 2007 (the full term of the note)—not June 16, 2006 through September 15, 2007. The document reflected that, based on these calculations, $1,881,716.85 was the amount required "to bring payments current with the amortization schedule."

Accordingly, there was no conflict between the affidavits of Lundy and Psencik rendering it impossible to determine a total amount outstanding. Rather, the two affidavits are reconcilable because they show that the amount referenced in Lundy's affidavit was subsumed within the amount referenced in Psencik's affidavit. Therefore, Dynegy proved an amount due and owing, but that figure was $1,881,716.85.[5]

### 2. Owner–and–Holder Status

The note was payable to DASC, but Dynegy brought suit thereon. In her affidavit, Lundy averred as follows: (1) an exhibit attached to her affidavit was a true and correct copy of the note, and Dynegy was legal owner and holder; (2) the note was made payable to DASC because it is a Dynegy subsidiary that was used to collect certain monies owed to Dynegy; (3) on July 19, 2004, DASC "granted, transferred and assigned" all of its interest in the note to Dynegy, including any rights or obligations to collect the balance owed; and (4) another attached exhibit was a true and correct copy of the "Assignment of Notes." Psencik also attached a "true and correct" copy of the note to her affidavit and swore that Dynegy is owner and holder.[6]

In the referenced "Assignment of Notes," which was executed by a DASC Assistant Treasurer, R. Kyle Kettler, DASC indeed assigned its interest in several notes, including McLernon's, to Dynegy. In the instrument, Kettler further stated that (1) Dynegy advanced funds to some of its officers to purchase stock, (2) it engaged DASC to act as collection agent, (3) in this role, DASC was named as payee under the notes, and (4) Dynegy no longer desired that DASC act as collection agent.

McLernon's challenges to this evidence fit into two categories: (1) Lundy's averment regarding Dynegy's owner-and-holder status was conclusory or negated by other evidence; and (2) the assignment was invalid.

#### a. Lundy's Affidavit

■ To challenge Lundy's affidavit, McLernon cites an excerpt from her deposition in which McLernon's counsel asked, "What is an owner and holder of a note?" Dynegy's counsel objected that the ques-

---

5. McLernon also argues that Lundy's deposition testimony created a fact issue on whether the amount she calculated was due and owing "under the note itself" because Lundy admitted "going outside of the note to determine what amount was due and owing." However, this challenge to Lundy's calculations is moot because the amount she referenced was subsumed within the amount subsequently calculated by Psencik, whose affidavit was alone sufficient to prove the balance due. Nonetheless, Lundy indeed confirmed that she would consider other amounts owed by, or to, McLernon, separate from obligations under the note, to calculate the total balance.

However, she also testified, "I'm not aware of anything else that Mr. McLernon owes the company besides this note." Accordingly, her testimony did not constitute evidence that the outstanding balance included any charges other than the amount owed under the note.

6. Psencik included no statements regarding the assignment. Therefore, although the amount referenced in Lundy's affidavit was subsumed within the amount subsequently referenced by Psencik, Lundy's affidavit remains relevant to the owner-and-holder issue.

tion asked for a "legal conclusion." McLernon suggests this objection constituted an acknowledgement that Lundy's testimony, via affidavit or otherwise, regarding Dynegy's status as owner and holder, was conclusory. We note McLernon does not directly challenge Psencik's identical averment regarding owner-and-holder status. Nevertheless, we will construe his argument that such a statement was conclusory as applicable to both affidavits. However, we disagree that an objection by counsel is controlling on whether testimony was indeed conclusory. Instead, we follow Supreme Court of Texas precedent holding an affiant's testimony that an attached exhibit is a true and correct copy of a note and he is owner and holder is sufficient summary-judgment evidence to establish this status absent controverting evidence. *See Zarges v. Bevan,* 652 S.W.2d 368, 369 (Tex.1983). Moreover, Dynegy did not rely solely on these affiants to prove owner-and-holder status because it also presented the above-cited evidence proving the assignment.

McLernon argues Dynegy's own summary-judgment evidence negated Dynegy's claimed status as owner and holder. He cites an April 19, 2004 demand letter from Dynegy's counsel to McLernon stating, "This firm represents [DASC] ("Lender"), who is the current owner and holder of the above-referenced Note and the party entitled to receive payment of all amounts due thereunder." The summary-judgment evidence included several such demand letters. However, they were written before DASC assigned the note to Dynegy. Thus, the letters do not controvert the proof that Dynegy subsequently became owner and holder.

McLernon also suggests Lundy admitted in her deposition that DASC is "payee," thus negating Dynegy's status as owner and holder. However, she actually indicated that *the note showed* DASC as payee, which was a correct statement, although DASC subsequently assigned its interest to Dynegy.

McLernon further asserts Lundy admitted that her conclusion Dynegy is owner and holder was based on a reading of the note, although Dynegy was not mentioned on the note. McLernon also contends Lundy's deposition testimony that the purpose of the assignment was transfer of DASC's interest as "collection agent" indicated the assignment rendered Dynegy merely a collection agent. However, construing her testimony as a whole, Lundy seemed to suggest that Dynegy, as the entity advancing the funds, was always owner and holder, and DASC's interest as "payee" meant only that it served as collection agent. Further, she did not testify that DASC retained any interest in the note after the assignment; rather, she suggested the assignment was intended to transfer solely DASC's role as collection agent because that is the only interest it effectively ever held.

Any mistakes in Lundy's testimony regarding the entities' statuses before the assignment did not negate the clear terms of the note and the assignment instrument demonstrating DASC was originally both payee and collection agent and later assigned all its interests to Dynegy. Finally, to the extent McLernon cites these deposition excerpts to suggest Lundy's affidavit was conclusory regarding owner-and-holder status because she did not understand the meaning of the term, he fails to attack Psencik's statement that Dynegy is owner and holder, which was sufficient to establish this status. *See id.* at 369.

#### b. Validity of the Assignment

█ McLernon first argues Dynegy failed to prove, and the summary-judgment evidence actually negated, that Kett-

ler possessed authority to execute the assignment instrument. McLernon cites a paragraph of DASC's bylaws prescribing powers and duties of Assistant Treasurers:

> **6.10 Assistant Treasurers.** Each Assistant Treasurer shall have such powers and duties as may be assigned to him by the Board of Directors, the Chairman of the Board, or the President. The Assistant Treasurers (in the order of their seniority as determined by the Board of Directors or, in the absence of such a determination. as determined by the length of time they have held the office of Assistant Treasurer) shall exercise the powers of the Treasurer during that officer's absence or inability to act.

As McLernon asserts, this provision did not specifically grant an Assistant Treasurer authority to execute an assignment. McLernon further relies on Kettler's deposition testimony that neither the Board of Directors, the Chairman of the Board, nor the President, instructed him to execute the instrument assigning McLernon's note. Instead, Kettler indicated that the decision to make the assignment was generated by the Chief Financial Officer although the legal department was involved in the matter.

However, the above-quoted paragraph was clearly not intended to outline the specific powers and duties of an Assistant Treasurer or require that the Board, Chairman, or President dictate every task that an Assistant Treasurer performs within his position. The paragraph simply ensured that the Board, Chairman, or President generally assigned the Assistant Treasurer's powers and duties.

Kettler testified that his authority to make the assignment at issue emanated from his position as Assistant Treasurer, in which his duties included "cash management, investments, liability management, compliance with our debt agreements, and

... overseeing the employee loan program ... [f]rom the treasury department's perspective." Kettler more specifically explained that he unquestionably had authority to assign the note because his "job" encompassed facilitating collection of the notes and moving assets among Dynegy entities. Moreover, these duties were necessarily prescribed by the Board, Chairman, or President, considering that they possessed sole authority under the bylaws to prescribe his duties. Accordingly, Kettler established that he possessed authority to execute the assignment within the purview of his general duties even if the decision to make this specific assignment was generated by the Chief Financial Officer rather than the Board, Chairman, or President.

 McLernon also challenges validity of the assignment on the ground that it was not supported by consideration. However, an assignee of a cause of action, including an owner and holder of a note by virtue of an assignment, may enforce its rights against the obligor irrespective of whether any consideration was exchanged for the assignment. *See Carter v. DeJarnatt,* 523 S.W.2d 88, 90 (Tex.Civ.App.-Texarkana 1975, writ ref'd n.r.e.); *Glass v. Carpenter,* 330 S.W.2d 530, 537 (Tex.Civ. App.-San Antonio 1959, writ ref'd n.r.e.); *Hughes v. Dopson,* 135 S.W.2d 148, 149–50 (Tex.Civ.App.-Amarillo 1939, no writ). Accordingly, whether consideration was exchanged for this assignment was immaterial to Dynegy's right to enforce the note against McLernon.

In sum, Dynegy established it is owner and holder of the note. Accordingly, Dynegy met its initial burden to prove all elements of its claim, albeit subject to our clarification regarding the amount due and owing.

## B. McLernon's Affirmative Defenses and Counterclaims

Relative to Dynegy's motion, McLernon essentially presented two theories to oppose enforcement of the note: (1) fraudulent inducement; and (2) lack of consideration. As we will explain, these theories were pertinent to both McLernon's affirmative defenses and counterclaims.

### 1. Fraudulent Inducement

■ McLernon raised fraudulent inducement as an affirmative defense to enforcement of the note. Further, the sole ground for McLernon's counterclaims was fraudulent inducement, but he requested damages and attorneys' fees in addition to rescission of the note. Although McLernon sought more relief via his counterclaims than mere avoidance of the note, the fraudulent-inducement affirmative defense and counterclaims were based on the same underlying contention, so we will discuss them together.

■ A contract is subject to avoidance on the ground of fraud. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex.1990); *see Cecil v. Zivley*, 683 S.W.2d 853, 857 (Tex. App.-Houston [14th Dist.] 1984, no writ). To prevail on a fraudulent-inducement contention, a party must establish the elements of fraud "as they relate to an agreement between the parties." *Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex.2001). The elements of fraud are (1) a material misrepresentation, (2) made with knowledge of its falsity or without any knowledge of the truth and as a positive asser-

tion, (3) made with the intention that it should be acted on by the other party, and (4) the other party acts in reliance on the misrepresentation and thereby suffers injury. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex.1998).

To raise a fact issue on his fraudulent-inducement claim, McLernon relied on his averment that Dynegy induced his execution of the note and the severance agreement by representing it was requiring all executives who participated in the stock-purchase program to repay their loans in full although, in actuality, loans to some other executives had already been reduced or forgiven.[7]

Dynegy did not challenge McLernon's evidence relative to the elements of fraud. Instead, Dynegy countered that any fraudulent-inducement claim was barred as a matter of law for two independent reasons: (1) in the severance agreement, McLernon released such a claim; or (2) in the severance agreement, he disclaimed reliance on any representations of Dynegy which formed the basis for such a claim. In contrast, McLernon contends the release and disclaimer were ineffective to bar the claim.

We conclude that McLernon's fraudulent-inducement claim, whether the basis of his affirmative defense or counterclaims, was barred by the disclaimer of reliance; thus, we need not consider the release, at least with respect to Dynegy's motion for

---

7. As we have mentioned, in his affidavit, McLernon also alleged another area of fraud: Dynegy's inducing his participation in the stock-purchase program by touting its financial strength and stock value when it had already implemented Project Alpha to conceal its true financial picture and artificially inflate the stock value. However, this contention concerned McLernon's decision to participate in the stock-purchase program in the first place and execute the associated original note. Dynegy's suit is not based on the original note because it was cancelled by execution of the replacement note. Accordingly, the representation pertinent to this suit on the replacement note is the statement that Dynegy was requiring all executives to repay their loans.

summary judgment.[8]

The disclaimer provided in pertinent part,

> [T]his [severance agreement] sets forth the entire agreement between the parties hereto and supercedes any and all prior agreements or understandings, written or oral, between the parties pertaining to the subject matter of this [severance agreement]. This [severance agreement] expresses the full terms upon which [Dynegy] and [McLernon] conclude the employment relationship. All obligations or responsibilities of either party under the [employment agreement] are encompassed within or superceded by this [severance agreement]. There are no other representations or terms relating to the employment relationship or the conclusion of that relationship other than those set forth in writing in this [severance agreement]. [McLernon] hereby represents and acknowledges that in executing this [severance agreement], [McLernon] does not rely and has not relied upon any representations or statements made by any of the parties, agents, attorneys, employees, or representatives with regard to the subject matter, basis or effect of this [severance agreement].

*Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex.1997) and *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex.2008) are the seminal cases on enforceability of a disclaimer of reliance. In *Schlumberger*, the court emphasized that the principle recited in earlier cases recognizing fraud vitiates a contract must be weighed against the competing concern that parties should be able to fully and finally resolve their disputes by bargaining for and executing a release barring all further disputes. *Id.* at 179. Based on this latter concern, the court held, "a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." *Id.* at 181.

The court further remarked that a disclaimer will not always preclude a fraudulent-inducement claim. *Id.* However, on the particular *Schlumberger* record, the disclaimer conclusively negated the reliance element of the claim. *Id.* In support, the court considered the language of the disclaimer under well-established rules of contract construction and circumstances surrounding its formation. *Id.* at 179–80. The plaintiffs clearly disclaimed reliance on representations by the defendant about the subject matter of the agreement containing the disclaimer. *Id.* at 180. Other pertinent factors were that the parties executed the agreement to end their "deal" and resolve a dispute regarding the project at issue, both were represented by highly competent legal counsel, the parties dealt at arm's length, and both were "knowledgeable and sophisticated business players." *Id.*

Later, in *Forest Oil*, the court upheld a disclaimer of reliance in a settlement agreement that was intended to resolve both past and future claims. 268 S.W.3d

---

8. The release is relevant to McLernon's motion, so we will later discuss that issue. However, relative to the fraud claim, we do note McLernon argued that, even if the release were effective, it barred at most the counterclaim, and not his affirmative defense, because he released only his right to "commence a lawsuit" and assert a "claim" for fraud. We need not address this distinction because the disclaimer of reliance barred both the affirmative defense and counterclaim. Thus, for ease of discussion on the disclaimer issue, our reference to the fraud "claim" includes both the affirmative defense and the counterclaim.

at 53–54, 56–58. The court reaffirmed that facts may exist showing such a provision lacks " 'the requisite clear and unequivocal expression of intent necessary to disclaim reliance,' " but a court must always examine the contract and totality of the circumstances to determine if the disclaimer is binding. *Id.* at 60 (quoting *Schlumberger,* 959 S.W.2d at 179). Because courts of appeals had seemingly disagreed since *Schlumberger* on which facts were most relevant, the *Forest Oil* court held that the following should guide a decision on enforceability of a disclaimer of reliance: "(1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations, the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear." *Id.*

Finally, the *Forest Oil* court emphasized policy reasons for upholding a disclaimer of reliance that is otherwise enforceable after applying these guidelines:

> Refusing to honor a settlement agreement—an agreement highly favored by the law—under these facts would invite unfortunate consequences for everyday business transactions and the efficient settlement of disputes. After-the-fact protests of misrepresentation are easily lodged, and parties who contractually promise not to rely on extra-contractual statements—**more than that, promise that they have in fact not relied upon such statements**—should be held to their word. . . . If disclaimers of reliance cannot ensure finality and preclude post-deal claims for fraudulent inducement, then freedom of contract, even among the most knowledgeable parties advised

by the most knowledgeable legal counsel, is grievously impaired.

*Id.* at 60–61 (emphasis in original) (citations omitted); *see Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323, 332–35 (Tex.2011) (reiterating rules and policy considerations announced in *Schlumberger* and *Forest Oil* although holding provision at issue was only merger clause, not disclaimer of reliance).

Applying these guidelines in the present case, we conclude the disclaimer of reliance was enforceable as a matter of law.

***Whether the parties negotiated the contract terms and discussed the topic of the subsequent dispute.***

The severance agreement was negotiated—not boilerplate—because its terms, including the provision requiring repayment of the loan and execution of the replacement note, were unique to the relationship between McLernon and Dynegy. McLernon suggests this factor was not satisfied because he swore in his affidavit that Dynegy, not McLernon, drafted the severance agreement:

> Dynegy's Chairman, Daniel Dienstbier, presented me with the [severance agreement] and negotiated the terms of the [severance agreement] on behalf of Dynegy. Either Dynegy, or its agents, drafted the [severance agreement]. Neither I, nor my agents, played any role in the drafting of the [severance agreement].

Construed in context, McLernon merely averred that Dynegy physically prepared the severance agreement. The fact that one party actually drafted the agreement does not control whether its terms were negotiated, as opposed to boilerplate. McLernon did not deny he played a role in deciding the terms or claim that Dynegy merely gave him the agreement and instructed him to sign. To the contrary,

McLernon's statement that Dynegy's chairman "negotiated" the terms demonstrates McLernon was involved in deciding the terms because the word "negotiated" entails participation of both parties.

McLernon also asserts that, before execution of the severance agreement, the parties did not discuss the fraud claim and he was unaware of any material misrepresentations by Dynegy. However, the relevant fact under the first guideline is that the parties discussed McLernon's obligation to repay the loan and execution of the replacement note because this issue is the topic of the present dispute. The inquiry under this guideline cannot be whether they discussed the fraudulent-inducement claim or whether he was aware of the misrepresentations at issue. Axiomatically, if contracting parties discussed a fraudulent-inducement claim and the complaining party was aware of the material misrepresentations before signing the agreement, there would be no such fraud claim because he could not have been deceived into signing the agreement. The significant point with respect to the *Forest Oil* factors is that McLernon was aware of Dynegy's specific representations concerning the topic of the present dispute yet elected to disclaim reliance on those representations.

### Whether the parties dealt with each other in an arm's length transaction

On appeal, McLernon does not challenge whether this guideline was met. Nonetheless, the severance agreement reflects it resulted from an arm's length transaction because McLernon acknowledged therein that (1) he was "advised in writing by [Dynegy] to consult with an attorney before executing this [severance agreement]," (2) he was "extended a period of twenty-one (21) days within which to consider this [severance agreement] and this has afforded [him] ample opportunity to consult with personal, financial, and legal advisors prior to executing this [severance agreement]," and (3) he executed the severance agreement "voluntarily, knowingly, and without any duress or coercion." McLernon presented no controverting evidence indicating that Dynegy advised him on the prudence of executing the agreement or the scope and effect of any terms.

### Whether the parties were knowledgeable in business matters

McLernon also does not challenge whether this guideline was met. Nevertheless, the evidence established that McLernon was knowledgeable in business matters because he was an Executive Vice–President of Dynegy—a publicly traded company.

### Whether the language was clear

McLernon insists that *Schlumberger* and *Forest Oil* are not persuasive in the present case because his disclaimer was not as broad as the provisions at issue in those cases, which respectively stated in pertinent part:

> "[E]ach of us ... expressly warrants and represents and does hereby state ... and represent ... that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that **none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment** and each has been represented by ... legal counsel in this matter. The aforesaid legal counsel has read and explained to each of us the entire contents of this Release in Full, as well as the legal consequences of this Release...."

*Schlumberger,* 959 S.W.2d at 180 (emphasis in original opinion).

Each of the Plaintiffs and Intervenors expressly warrants and represents and does hereby state and represent that no promise or agreement which is not herein expressed has been made to him, her, or it in executing the releases contained in this Agreement, and that **none of them is relying upon any statement or any representation of any agent of the parties being released hereby.**

*Forest Oil,* 268 S.W.3d at 54 n. 4 (emphasis added).

McLernon contends he more narrowly acknowledged that "[t]here are no other representations or terms relating to the employment relationship or the conclusion of that relationship other than those set forth in writing in this [severance agreement]." He argues the representation by Dienstbier that Dynegy was requiring all executives to repay their loans was not a matter relating to "the employment relationship or the conclusion of that relationship." We need not decide whether the representation was encompassed within this portion of the provision at issue because the following portion was a clear disclaimer of reliance on Dienstbier's representations:

> [McLernon] hereby represents and acknowledges that in executing this [severance agreement], [McLernon] does not rely and has not relied upon any representations or statements made by any of the parties, agents, attorneys, employees, or representatives with regard to the subject matter, basis or effect of this [severance agreement].

Dienstbier's statement that Dynegy was requiring all executives to repay their loans was a representation "with regard to the "subject matter" of the severance agreement because it contained an express provision wherein McLernon agreed to repay the loan over a five-year period and execute a replacement note for the out-standing amount. Therefore, the fact that McLernon's disclaimer is narrower than the *Schlumberger* and *Forest Oil* provisions actually reinforces that it was enforceable; rather than simply disclaiming reliance on all representations in general, McLernon disclaimed reliance on representations regarding a specific subject matter of the severance agreement that is now in dispute—Dynegy's attempt to recover outstanding amounts due under the note.

***Whether the complaining party was represented by counsel***

We consider this guideline last because it is the only one on which the evidence is not conclusive. Dynegy did present evidence indicating McLernon was represented by counsel because an attorney returned McLernon's executed signature page for the severance agreement to Dynegy. However, we acknowledge that the evidence is scant on the extent to which McLernon was advised by counsel regarding execution of the agreement.

Regardless, on appeal, McLernon does not challenge this factor relative to whether he was represented by counsel. Instead, McLernon merely cites differences between the disclaimers in *Forest Oil* and the present case. In the *Forest Oil* disclaimer, the parties acknowledged that "each has had the opportunity to consult with counsel and has been fully advised by counsel prior to the execution of this Agreement" and "legal counsel for Plaintiffs have read and explained to each of the Plaintiffs the entire contents of the releases contained in this Agreement as well as the legal consequences of the releases." 268 S.W.3d at 54 n. 4. The disclaimer in the present case is silent on whether McLernon was represented by legal counsel. However, this omission is not dispositive. Although the *Forest Oil* court upheld a disclaimer containing the above-cited lan-

guage, the court merely stated that the pertinent factor was whether the complaining party was represented by counsel and did not require that an enforceable disclaimer necessarily include language confirming such representation. *See id.* at 60–61.

Additionally, McLernon asserts in his brief that "the summary-judgment evidence actually reflects that the 'legal consequences' of the [severance agreement] were not explained" to him. However, in the referenced portion of his affidavit, McLernon averred that no *Dynegy* representative explained the legal consequences to him. McLernon does not claim that he lacked his own counsel to explain the consequences. The supreme court did not set forth as a factor whether the consequences of a disclaimer were explained to the releasing party by the *other party*. *See generally Forest Oil,* 268 S.W.3d 51; *Schlumberger,* 959 S.W.2d 171. Indeed, the nature of an arm's length transaction entails that the releasing party would not depend on the other party to explain the consequences of the agreement, and such an explanation might actually negate they dealt at arm's length.

Moreover, the supreme court referred to the five *Forest Oil* considerations as "facts ... that guide[ ] our reasoning" and "factors"—not elements that all must be established before a disclaimer of reliance is enforceable. 268 S.W.3d at 60. Accordingly, even if McLernon was not advised by counsel, we would still uphold the disclaimer under the circumstances of this case because the other guidelines are satisfied. Significantly, as discussed, McLernon was advised, and given ample opportunity, to consult counsel; even if he elected not to do so, he represented in the severance agreement that he "has carefully read ... and understands its contents" and "fully understand[s] and agree[s] to be

bound by all of the provisions...." Considering these representations together with McLernon's business knowledge and the clear language of the disclaimer, we conclude that any lack of advice from counsel did not nullify enforceability of the disclaimer.

■ Finally, in addition to his arguments regarding the above-discussed factors, McLernon contends the disclaimer is unenforceable because the *Schlumberger* parties executed their release to end a long-standing dispute whereas McLernon and Dynegy were not embroiled in any dispute which precipitated the severance agreement. *See Schlumberger,* 959 S.W.2d at 179–81. McLernon suggests that post-*Schlumberger* courts of appeals have refused to enforce disclaimers when included in a contract that was not intended to resolve an ongoing dispute. *See, e.g., Warehouse Assocs. Corporate Centre II v. Celotex Corp.,* 192 S.W.3d 225, 234 (Tex. App.-Houston [14th Dist.] 2006, pet. denied) (holding that disclaimer of reliance in a contract for sale of property was unenforceable because the decisive factor in *Schlumberger* was parties' intent to definitively resolve a long-running dispute).

First, we disagree there was no "dispute" between McLernon and Dynegy relative to the *Schlumberger* court's reason for emphasizing this fact: the ability of parties to fully and finally resolve their disputes and prevent further disputes. *See Schlumberger,* 959 S.W.2d at 179. We recognize there was no evidence that McLernon and Dynegy had asserted any claims against each other or were engaged in a long-standing or contentious conflict when they executed the severance agreement. Nonetheless, they settled a "dispute" in the sense that they terminated an existing relationship and associated contract, as opposed to forming a new relationship, and thereby resolved potential

disputes relating to both the relationship and its termination. Indeed, the parties recited that Dynegy promised to pay McLernon the referenced amounts under the agreement "[i]n settlement of all claims arising out of [McLernon's] employment with, or termination of employment with [Dynegy], and all claims arising out of the termination of the [employment agreement.]." McLernon's agreement to repay the loan encompassed a future-performance aspect of the severance agreement because the payment period was extended and the obligation would be governed by a new note. However, this agreement was a compromise relative to an existing obligation created within the employment relationship. Consequently, enforcing the disclaimer in the present case precludes perpetual disputes triggered by any alleged misrepresentations about a matter settled in the severance agreement.

Regardless, after *Schlumberger* as well as *Celotex*, the *Forest Oil* court made clear that enforcement of a disclaimer of reliance was not limited to situations in which parties were settling a past dispute. The *Forest Oil* parties not only settled their long standing dispute over oil and gas royalties and leasehold development of certain property but also incorporated a separate agreement governing ongoing care of the surface estate and agreed to arbitrate future disputes. 268 S.W.3d at 53–54. The plaintiffs subsequently filed suit regarding an issue within the scope of the ongoing relationship and opposed the defendant's attempt to compel arbitration, claiming the agreement was induced by fraud. *Id.* at 54–55. The defendant contended that the disclaimer of reliance in the agreement barred the fraudulent-inducement contention. *Id.* at 56. The plaintiff attempted to distinguish *Schlumberger* on the ground that the alleged misrepresentations therein concerned the subject matter of the dispute resolved in the

agreement whereas the alleged misrepresentations in *Forest Oil* concerned the parties' future relationship and issues specifically excepted from the agreement. *Id.* at 57–58.

The court rejected the notion that this distinction was material, remarking that *Schlumberger* was not so limited and an otherwise enforceable disclaimer of reliance should be upheld whether the allegedly fraudulent representation pertained to settled claims or an agreement concerning resolution of future claims. *Id.* at 58. Moreover, the supreme court referenced *Celotex* when it commented that courts of appeals had disagreed on the decisive factors for enforcing a disclaimer and enunciated the relevant factors, which excluded consideration of whether the agreement settled a long-running dispute. *Id.* at 60 & n. 32. Accordingly, the disclaimer in the present case is not ineffective simply because the alleged misrepresentations at issue concerned an aspect of the severance agreement involving a future obligation—repayment of the loan.

## 2. Consideration

McLernon's lack-of-consideration contention was also relevant to both his affirmative defenses and counterclaims. As an affirmative defense, McLernon directly challenged the note for lack of consideration irrespective of his fraudulent-inducement contention. McLernon also suggested the severance agreement was invalid for lack of consideration, attempting to prove the disclaimer of reliance contained therein cannot bar his fraudulent-inducement affirmative defense and counterclaims. Despite his different reasons for challenging the note and severance agreement based on this ground, we employ a similar analysis to dispose of both contentions.

Generally, a contract must be supported by consideration to be enforceable. *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 659 (Tex. 2006). Consideration consists of a benefit to the promisor or a detriment to the promisee. *N. Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 607 (Tex.1998). Consideration for a promise may be either a performance or a return promise bargained for in a present exchange. *Johnson*, 209 S.W.3d at 659 (citing *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex.1991); Restatement (Second) of Contracts § 71(1) (1981)). Lack of consideration for a contract is an affirmative defense to its enforcement; therefore, McLernon was required to raise a fact issue on lack of consideration. *See* Tex.R. Civ. P. 94; *Kaye/Bassman Intern. Corp. v. Help Desk Now, Inc.*, 321 S.W.3d 806, 814 (Tex.App.-Dallas 2010, pet. denied).

### a. Consideration for the Note

At the outset of the note, McLernon recited that his promise to pay the subject amount was made "[f]or value received." "[A] written instrument reciting a consideration imports one, and with such a recitation we presume the consideration [to be] sufficient." *Hoagland v. Finholt*, 773 S.W.2d 740, 743 (Tex.App.-Dallas 1989, no writ). However, parol evidence is admissible to show want or failure of consideration and establish the actual consideration given for the instrument. *DeLuca v. Munzel*, 673 S.W.2d 373, 376 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.) (citing *Fire Ins. Ass'n v. Wickham*, 141 U.S. 564, 579–82, 12 S.Ct. 84, 35 L.Ed. 860 (1891); *Gaines Motor Sales Co. v. Hastings Mfg. Co.*, 104 S.W.2d 548, 551 (Tex. Civ.App.-Fort Worth 1937, writ dism'd)).

The note was payable to DASC, but Dynegy was the party who advanced the funds for the stock purchase. Therefore, McLernon suggests he received no consideration from DASC in return for his promise to make payments to that entity. We disagree.

Whether McLernon's receipt of funds from Dynegy constituted consideration for a note payable to DASC might have been an issue pertinent to enforceability of the original note. The funds were advanced and McLernon executed the original note relative to the initial stock purchase in October 2001. However, the present suit is based on the replacement note. Dynegy advanced no new loan funds with respect to McLernon's execution of the replacement note in September 2002. Rather, it was executed to extend the repayment period for the existing loan from two years to five years. Because DASC was payee under both the original and replacement notes, this extension constituted consideration from DASC to McLernon in exchange for his promise to make payments under the replacement note. *See First Commerce Bank v. Palmer*, 226 S.W.3d 396, 398–99 (Tex.2007) (holding that defendants' new guaranty executed to secure payment of renewal promissory note and prevent payee from accelerating debt due under original note, for which defendants were also guarantors, was supported by consideration because, among other reasons, defendants benefited from extension of their obligation to pay original note); *Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 107 (Tex.App.-Dallas 1987, writ ref'd n.r.e.) (holding that restructuring of existing debt conferred benefit on guarantor which constituted consideration supporting guaranty).

### b. Consideration for the Severance Agreement

At the outset of the severance agreement, the parties recited their agreements were made "in consideration of the

promises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged." McLernon relied on his affidavit to raise a fact issue on whether the severance agreement was supported by consideration despite this recitation. Specifically, McLernon swore he was already entitled to a severance payment of $2,392,000 under his employment agreement notwithstanding Dynegy's promise in the severance agreement to pay this amount. McLernon did not specifically mention the $161,771.99 that Dynegy promised to pay for benefits to which he would have been otherwise entitled through the end of his employment term. Nevertheless, because these benefits would have been paid during a contractually-defined term, we will assume for sake of argument that McLernon was already entitled to this amount as well, notwithstanding the severance agreement. Additionally, the severance agreement stated that McLernon "has previously received his executive benefit from [Dynegy's] deferred compensation plan." It is unclear from this provision whether McLernon received this deferred compensation in conjunction with termination of his employment. Regardless, McLernon suggested in his affidavit that he received this deferred compensation pursuant to the severance agreement but thereby suffered a penalty of $60,000. In sum, McLernon argues that he experienced an overall detriment under the severance agreement because he merely received payments to which he was already entitled and additionally suffered a penalty. He further contends that Dynegy may not cite its agreement to provide McLernon with continued group health insurance benefits at the active-employee rate as evidence of consideration without first proving the value of this benefit exceeded the $60,000 penalty.

Even if McLernon was already entitled to the monetary payments and additionally suffered a penalty, the evidence establishes that he received at least one benefit under the severance agreement: Dynegy's agreement to extend the repayment period on his loan in accordance with the contemporaneously-executed replacement note. We recognize that DASC, as payee under the original and replacement notes, was technically the party who provided the extension. Nevertheless, as discussed, the evidence reflects that Dynegy controlled decisions regarding the loan program and made DASC payee on the notes to facilitate its role as collection agent. "To constitute consideration, ... [t]he performance or return promise ... may be given by the promisee *or by some other person.*" Restatement (Second) of Contracts § 71 (1981) (emphasis added). "It matters not from whom the consideration moves or to whom it goes. If it is bargained for and given in exchange for the promise, the promise is not gratuitous." *Id.* cmt. c. Because Dynegy caused DASC to extend the repayment period in exchange for McLernon's promises in the severance agreement, McLernon received consideration from Dynegy under the agreement.

In sum, the trial court properly concluded the disclaimer of reliance in the severance agreement barred McLernon's fraudulent-inducement affirmative defense and counterclaims and that the note and severance agreement were supported by consideration. Accordingly, McLernon failed to raise a genuine issue of material fact on any affirmative defenses to Dynegy's claim, and Dynegy proved entitlement to summary judgment on McLernon's counterclaims. We overrule McLernon's fourth issue.

### V. McLernon's Motion For Summary Judgment

McLernon contends the trial court erred by denying his own motion for sum-

mary judgment because he conclusively established the additional affirmative defenses of release, waiver, and res judicata.

All of these affirmative defenses were based on Dynegy's settlement of the class action arising from Project Alpha. On April 26, 2002, numerous plaintiffs across the country filed securities class actions against Dynegy in federal courts. These cases were consolidated into one suit entitled *In re Dynegy Inc. Securities Litigation* ("the class action") in the United States District Court for the Southern District of Texas. In early 2005, the federal court certified two classes, including a class consisting of persons alleging violations of the Securities Exchange Act of 1934 occurring between June 21, 2001 and July 22, 2002. By a written "Stipulation and Agreement of Settlement" dated April 29, 2005 ("the settlement agreement"), the parties settled the class action. Dynegy agreed to pay the classes $250 million in cash plus other consideration and released and waived various claims against the class members. The federal court subsequently approved the settlement agreement and signed a final judgment.

McLernon asserts that the release and waiver provisions in the settlement agreement barred Dynegy's present suit on the note, which had already been filed, because (1) McLernon was a member of the 1934-Act class based on his October 2001 stock purchase, and (2) the release and waiver provisions were sufficiently broad to encompass any right to enforce the note. Alternatively, McLernon contends that, even if the release and waiver provisions did not encompass Dynegy's right to enforce the note, the present suit is barred under the doctrine of res judicata because Dynegy should have asserted this claim as a countersuit in the class action. *See Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex.1992) (stating that res judicata

"prevents the relitigation of a claim or cause of action that has been finally adjudicated, as well as related matters that, with the use of diligence, should have been litigated in the prior suit").

In contrast, Dynegy contends McLernon was not a class member; thus, he may not reap the benefits of the release and waiver provisions in the settlement agreement or assert that McLernon should have sought enforcement of the note in the class action under the doctrine of res judicata. Alternatively, Dynegy argues that, even if McLernon was a class member, (1) the release and waiver provisions did not encompass Dynegy's right to enforce the note, and (2) res judicata was inapplicable because the elements were not satisfied, Dynegy's suit on the note was not a compulsory counterclaim in the class action, and the federal court lacked jurisdiction to consider a countersuit against an individual class member. We need not address these alternative arguments because we agree McLernon was not a class member.

Among other reasons, Dynegy argues McLernon was not a class member because he had already released his right to assert the claims that were the subject of the class action by executing the severance agreement more than two years before class certification.

The "RELEASE" portion of the severance agreement provided in pertinent part:

In consideration of the mutual promises and covenants of [Dynegy] and [McLernon] hereunder, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, [*McLernon* ] *hereby releases, discharges in full and agrees to waive and forego any right he ... may have to commence a lawsuit against [Dynegy] ... from and for all rights, claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs, ex-*

*penses, damages, actions and causes of action, whether in law or in equity, whether known or unknown, suspected or unsuspected,* arising from or in any way relating to [McLernon's] employment with, and termination of employment and the [employment agreement] with [Dynegy], or *arising from or in any way relating to* [McLernon's] borrowing from [Dynegy] and/or *offers to purchase or the purchase of common stock of [Dynegy] from [Dynegy],* including but not limited to, any and all claims pursuant to [list of various federal acts]; and all other federal, state or local laws or regulations. *This Release also includes, but is not limited to, a release of any claims* for breach of contract, mental pain and anguish, impairment of economic opportunities, unlawful interference with employment rights, defamation, intentional or negligent infliction of emotional distress, fraud, *violations of state or federal securities laws,* wrongful termination, wrongful discharge in violation of public policy, breach of any express or implied covenant of good faith and fair dealing, bad faith, overtime pay, vacation pay, punitive damages, back pay, reinstatement, front pay, liquidated damages, injunctive relief, costs or attorneys' fees, based on or arising from or in any way relating to [McLernon's] employment by [Dynegy] and/or termination of [McLernon's] employment and the [employment agreement], *arising from or in any way relating to* [McLernon's] borrowing from [Dynegy] and/or *offers to purchase or the purchase of common stock of [Dynegy] from [Dynegy],* and all other common law contract and tort claims....

THE PRECEDING PARAGRAPH MEANS THAT UPON RECEIPT OF THE PAYMENTS DESCRIBED IN PARAGRAPH I OF THIS RELEASE, [MCLERNON] WILL HAVE WAIVED ANY RIGHT [MCLERNON] MAY HAVE TO BRING A LAWSUIT OR MAKE ANY LEGAL CLAIM AGAINST [DYNEGY] BASED ON ANY ACTIONS TAKEN BY THE COMPANY UP TO THE DATE OF SUCH RECEIPT OF PAYMENTS, OTHER THAN CLAIMS, IF ANY, ARISING UNDER OR CREATED BY THIS AGREEMENT.

(emphasis added).

This language clearly encompassed claims asserted in the class action because McLernon released "any right he ... may have to commence a lawsuit against [Dynegy] ... for ... all claims ... arising from or in any way relating to ... offers to purchase or the purchase of common stock of [ Dynegy] from [Dynegy] ... includ[ing] ... any claims for ... violations of state or federal securities laws."

On appeal, McLernon briefly suggests two reasons that the release in the severance agreement did not preclude his subsequent participation in the class action.

First, he states that a "narrow" severance agreement intended solely to terminate the employment relationship did not "automatically void" participation in a federal class action. Although the overarching purpose of the severance agreement was termination of the employment relationship, it included McLernon's express release of any claims against Dynegy relating to his stock purchase and violations of securities law. Therefore, it was this express release rather than merely the severance agreement that precluded McLernon's subsequent participation in the class action.

Second, McLernon suggests that, when he executed the severance agreement, he was unaware of his right to participate in the class action. However, the release in the severance agreement

expressly included "known or unknown, suspected or unsuspected" claims. Although a "release must 'mention' the claim to be effective" the parties need not "anticipate and identify each potential cause of action relating to the release's subject matter." *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh Pa.*, 20 S.W.3d 692, 698 (Tex.2000). Releases generally contemplate claims existing at the time of execution, but a valid release may also encompass unknown claims and future damages. *Keck*, 20 S.W.3d at 698; *Baty v. ProTech Ins. Agency*, 63 S.W.3d at 841, 848 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Accordingly, the release encompassed the claims made the basis of the class action even if they were unknown to McLernon when he executed the release.

Finally, as noted, some sub-issues relevant to Dynegy's motion for summary judgment are pertinent to our analysis of the present issue. As we discussed relative to Dynegy's motion, McLernon contended the severance agreement was fraudulently induced and lacked supporting consideration. Because we have rejected these arguments as a matter of law, the release contained within the severance agreement is likewise not void under these theories.

We express no opinion on the validity of any benefits or payments McLernon may have otherwise received under the class-action settlement as a purported class member. However, for purposes of the present suit, he was precluded from claiming the benefits of a class member to the extent he relies on the release and waiver provisions in the class-action settlement agreement or the doctrine of res judicata to defeat Dynegy's right to enforce the note. *See Wagner v. NutraSweet Co.*, 95 F.3d 527, 531–34 (7th Cir.1996) (holding that several former employees were barred from asserting certain claims in class action against defendant company based on allegedly discriminatory employment practices because they previously released the claims in connection with severance from the company).

In sum, because McLernon did not conclusively establish any affirmative defense raised in his motion for summary judgment, we overrule his first three issues.

## VI. CONCLUSION

The trial court did not err by granting Dynegy's motion for summary judgment relative to a portion of the total amount sought and denying McLernon's cross motion. We modify the judgment to order that Dynegy have and recover from McLernon $1,881,716.85 in principal and interest, costs of court, and post-judgment interest on the total judgment at 5% per annum, and we affirm as modified.