**Motion for Rehearing Denied, Motion for En Banc Rehearing Denied as Moot, Affirmed, Memorandum Opinion filed March 4, 2014 Withdrawn, and Substitute Memorandum Opinion filed June 3, 2014.**



**In the**

# Fourteenth Court of Appeals

---

**NO. 14-12-00940-CV**
**NO. 14-12-01077-CV**
**NO. 14-12-01139-CV**

---

## WCW INTERNATIONAL, INC., AND CHRIS WILMOT,

**Appellants/Cross-Appellees**

**V.**

## JERRY W. BROUSSARD, RONNIE D. LABORDE, DAVID M. KERNION, DAVID O. STRICKLAND, CRAIG M. BOREL, KEVIN J. ROUSSEL, GEORGE A. LOWERY, AND CARLOS O. GIRON,

**Appellees/Cross-Appellants**

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Cause No. 2009-12773**

---

# SUBSTITUTE MEMORANDUM OPINION

This consolidated appeal concerns a Stock Purchase Agreement ("SPA") entered into among appellant/cross-appellee WCW International, Inc. ("WCW"), and appellees/cross-appellants Jerry Broussard, Ronnie D. Laborde, David M. Kernion, David O. Strickland, Craig M. Borel, Kevin J. Roussel, George A. Lowery, and Carlos O. Giron. In the SPA, WCW agreed to purchase stock from appellees/cross-appellants,[1] who were shareholders in two engineering firms. This purchase was to be made partly in cash, with the rest to be represented by promissory notes. Appellant/cross-appellee Chris Wilmot, WCW's CEO and President, also executed a guaranty, wherein he agreed to be bound with WCW and deliver a letter of credit to Shareholders.

Shareholders ultimately sued WCW and Wilmot for breach of the SPA, the promissory notes, and the guaranty, and for fraud and fraudulent inducement. WCW and Wilmot counterclaimed for breach of the SPA, and for fraud and fraudulent inducement. The jury rendered findings mostly favorable to Shareholders and awarded damages to them on WCW's breach of the SPA and the promissory notes, and on the fraud claims. The trial court granted JNOV on the fraud findings and otherwise entered judgment on the verdict. WCW and Wilmot present six issues on appeal; Shareholders present one issue on cross-appeal.[2] Although we deny WCW's motion for rehearing, and deny its motion for en banc rehearing as moot, we withdraw the memorandum opinion issued in this case on March 4, 2014, and issue this substitute memorandum opinion. We affirm the trial court's judgment.

---

[1] We refer to the appellees/cross-appellants collectively as "Shareholders."

[2] The granting of JNOV on the fraud findings is no longer at issue in the cross-appeal.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

In late 2007, WCW, a company that provides engineering and other services, and Wilmot, WCW's sole shareholder, CEO, and President, expressed interest in purchasing two consulting engineering companies, Spectrum Engineering, Inc., and Spectrum Services, Inc. (collectively, "Spectrum"). Spectrum was owned by a group of eight shareholders: Jerry Broussard, Ronnie D. Laborde, David M. Kernion, David O. Strickland, Craig M. Borel, Kevin J. Roussel, George A. Lowery, and Carlos O. Giron. Starting in January 2008, WCW negotiated with Shareholders and engaged in due diligence for the purchase of 100% of Spectrum's outstanding stock. WCW/Wilmot's due diligence team consisted of Eric Amoako, Ed Laborde,[3] Musheer Robinson, Hal Bouknight, Mike Hagarty, Abe and Ahmad Fatemizadeh. WCW also retained CPA Dan Ramey with the accounting firm PKF Texas ("PKF") to provide a written due diligence report, which Ramey provided in February 2008 and updated in June 2008. PKF's report was based on financial data provided by Spectrum from 2005 through May 30, 2008.

WCW and Shareholders entered into the SPA, which had an effective date of July 16, 2008. The full purchase price was based on a four-times multiple of Spectrum's EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) at the end of 2007. WCW agreed to provide initial consideration of $4.6 million in cash on July 16, 2008; $3.8 million in deferred consideration, to be represented by promissory notes (the "Notes") to Shareholders and to be secured by a letter of credit ("LOC"); and $2.8 million in earnout consideration, for a total amount of $11.2 million. The $3.8 million represented by the Notes was to be paid in three installments: (1) $1 million on January 31, 2009; (2) $1 million on January 31, 2010; and (3) $1.8 million on January 31, 2011. The SPA included provisions

---

[3] Ed Laborde is not related to Shareholder Ronnie Laborde.

3

wherein Shareholders made certain representations regarding Spectrum's financial statements and status with regard to its customers, disclosures, accounts, and any litigation. The Shareholders[4] agreed to repay any outstanding indebtedness on company loans.

WCW did not provide the initial consideration or provide the LOC on July 16, 2008. Wilmot advised that the funds and LOC would be delivered on July 21. They were not. WCW and Shareholders then entered into a deposit agreement, wherein WCW agreed to place $250,000 in escrow, to be forfeited if WCW failed to pay the initial consideration and deliver the LOC by July 29, 2008. WCW failed to meet the deadline, and the $250,000 was forfeited to Shareholders.

In September 2008, WCW and Shareholders amended the SPA, requiring WCW to pay the initial consideration in three installments: (1) $250,000 by September 24, 2008; (2) $250,000 by October 8, 2008; and (3) the $4.1 million balance by October 31, 2008, along with the LOC. WCW also agreed to pay off or cause Shareholders' guarantees on Spectrum's line of credit at Whitney National Bank to be released by October 20, 2008. The amendment authorized a delay payment of $250,000 as liquidated damages for failure to timely pay the initial consideration and timely deliver the LOC. With this amendment, Shareholders released all closing documents to WCW, the stock transferred, and WCW assumed full management of Spectrum. The amendment had an effective date of July 16, 2008. At the same time as the amendment, Wilmot executed a commercial guaranty, wherein he agreed to be bound with WCW under the SPA, up to the sum of $4.1 million, and agreed to deliver the LOC.

---

[4] Each of the Shareholders classified as "Nonexempt"—Broussard, R. Laborde, Strickland, and Kernion—owed a loan to Spectrum in the amount of $11,551. They agreed to repay their loans at closing.

WCW paid Shareholders $250,000 on September 25, 2008, and $250,000 on October 8, 2008. WCW did not pay or cause Spectrum's bank indebtedness to be released by October 20, 2008. WCW did not make the remaining $4.1 million cash payment or provide the LOC by October 31, 2008. On November 10, 2008, Shareholders sent a notice of default letter to WCW. On November 26, 2008, WCW paid Shareholders $1 million but still had not delivered the LOC. WCW did not make its $1 million first payment on the Notes on January 31, 2009, and failed to make any subsequent payments.

In February 2009, Shareholders filed suit against WCW for breach of contract, against Wilmot for breach of guaranty, and against WCW and Wilmot for fraud and fraudulent inducement. WCW and Wilmot counterclaimed for breach of contract, and fraud and fraudulent inducement. The jury returned findings in favor of Shareholders on most issues. Specifically, in pertinent part, the jury found:

- WCW, Broussard, Kernion, R. Laborde, and Strickland breached the SPA.
- WCW failed to comply with the SPA first.
- WCW's failure to comply with the SPA was not excused.
- Broussard, Kernion, R. Laborde, and Strickland's failures to comply with the SPA were excused.
- WCW failed to pay all of the Shareholders' Notes.
- WCW's failure to pay the Notes was not excused.
- Wilmot failed to comply with the guaranty.
- Wilmot's failure to comply with the guaranty was not excused.
- WCW and Wilmot committed fraud in the inducement of a contract against all of the Shareholders. Shareholders did not commit fraud in the inducement of a contract against WCW and Wilmot.
- WCW and Wilmot committed common law fraud against all the Shareholders. Shareholders did not commit common law fraud against WCW and Wilmot.

5

- The following sums, if paid now in cash, would fairly and reasonably compensate the respective Shareholders for their damages proximately caused by WCW's breach: Borel, $63,264.80; Broussard, $1,601,713.80; Giron, $63,264.80; Kernion, $399,673.30; R. Laborde, $399,673.30; Lowery, $63,264.80; Roussel, $63,264.80; Strickland, $399,673.30—a total of just over $3 million.

- The following sums, if paid now in cash, would fairly and reasonably compensate the respective Shareholders for their damages proximately caused by WCW's failure to pay the Notes: Borel, $77,551; Broussard, $1,977,550; Giron, $77,551; Kernion, $504,082; R. Laborde, $504,082; Lowery, $77,551; Roussel, $77,551; Strickland, $504,082—a total of $3.8 million.

- No damages to Shareholders resulted from Wilmot's breach of the guaranty.

- The jury also awarded Shareholders damages on the fraud claims against WCW and Wilmot.

Shareholders moved for entry of judgment on the jury's verdict. WCW and Wilmot moved to disregard all of the jury's adverse findings. The trial court granted their motion as to the fraud findings, but otherwise entered judgment on the verdict—thus awarding the full amount of damages on the breach claims against WCW and no damages against Wilmot. The trial court awarded Shareholders attorneys' fees in an amount stipulated to by WCW. All parties appealed from the final judgment.

WCW and Wilmot attack the judgment in six issues. First, they contend there is no evidence that WCW breached the SPA first and conclusive evidence that Shareholders materially breached the SPA first. Second, WCW and Wilmot argue that there was a failure or lack of consideration as a matter of law, and the trial court erred by refusing to submit a jury question on Spectrum's value. Third, they argue that indemnification provisions in the SPA limit Shareholders' recovery to $500,000 as a matter of law. Fourth, they also argue that the SPA either

6

precludes or limits the recovery of certain Shareholders as to the Notes. Fifth, WCW and Wilmot contend that Shareholders' attorney's fee award must be reversed if the judgment against WCW is reversed or reduced. Finally, they argue that if a new trial is ordered on Shareholders' breach claims against WCW, then the new trial must include WCW and Wilmot's breach and fraud counterclaims. In their cross-appeal, Shareholders argue that the trial court erred in not holding Wilmot jointly and severally liable as to WCW's breach.

## II. LEGAL SUFFICIENCY STANDARD OF REVIEW

The test for legal sufficiency is whether the evidence at trial "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we must view the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id.* at 827. We assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregarded all other inferences. *Id.* at 821. We cannot substitute our judgment for that of the jury, so long as the evidence falls within the zone of reasonable disagreement. *Id.* at 822. The factfinder is the only judge of witness credibility and the weight to give to testimony. *Id.* at 819. We will sustain a legal sufficiency challenge only when: (1) the record discloses the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810. More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228

(Tex. 2011). Evidence is conclusive only if reasonable people could not differ in their conclusions, which depends on the facts of each case. *City of Keller*, 168 S.W.3d at 816. To successfully challenge the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, such as an affirmative defense, a party must conclusively establish all vital facts in support of that issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).

### III. ANALYSIS

**A. The evidence is legally sufficient to support the jury's findings that WCW breached the SPA first, the Nonexempt Shareholders' breaches were excused, and WCW's breach was not excused.**

WCW argues that, at the most, it breached the SPA by failing to release Spectrum's line of credit on October 20, 2008, and by failing to pay the remaining initial consideration and deliver the LOC by October 31, 2008. WCW and Wilmot contend that Shareholders' material breaches of the SPA occurred months earlier on July 16 or at the time of the amendment in September 2008, at the latest. They argue the trial record conclusively demonstrates that Shareholders—all of them— breached by failing to disclose or misrepresenting information they were required to provide to WCW under seven separate provisions of the SPA: sections 2.8 (Financial Statements), 2.13 (Litigation), 2.14 (Customers and Suppliers), 2.15 (Accounts Receivable and Accounts Payable), 2.27 (Brokers/Advisors), 2.29 (Due Diligence Information), and 2.30 (Disclosure Schedules). They also argue that the Nonexempt Shareholders, Broussard, R. Laborde, Strickland, and Kernion, whom the jury found breached the SPA, committed their breaches on the same day by not paying back their company loans as required by section 1.4.

Shareholders argue there is some evidence, or the evidence conclusively proves, that WCW breached the SPA first and without excuse, and that there is no

8

evidence or conflicting evidence that Shareholders materially breached and breached first. They assert that WCW breached the SPA on July 16, 2008, when it failed to pay the initial consideration and failed to deliver the LOC. Shareholders argue that their alleged nondisclosures or misrepresentations did not constitute breaches of the SPA, were not material, and were excused. Shareholders also argue that the Nonexempt Shareholders planned to offset their loans, and the jury reasonably could have found that their failure to repay the de minimis officer loans at closing was excused.

A party breaches a contract when it neglects or refuses to perform a contractual obligation. *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). If the breach is material, the other party is excused from further performance of the contract. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam) (citing *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)). Generally, the issue of whether a breach rises to the level of a material breach presents a dispute for resolution by the trier of fact. *See Hiles v. Arnie & Co., P.C.*, 402 S.W.3d 820, 831 (Tex. App.—Houston [14th Dist.] 2013, pet. filed). Materiality depends on several circumstances, including:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; [and]
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair

dealing.

*Mustang Pipeline*, 134 S.W.3d at 199 (citing Rest. (2d) of Contracts § 241 (1981)). Because we are dealing with dual findings that WCW and certain Shareholders breached the SPA, we must determine whether there is legally sufficient evidence that WCW materially breached first. *See Casarez v. Alltec Constr. Co., Inc.*, No. 14–07–00068–CV, 2007 WL 3287933, at *4 (Tex. App.—Houston [14th Dist.] Nov. 6, 2007, no pet.) (mem. op.).

We conclude that there is legally sufficient evidence to support the jury's findings. WCW does not contest that it materially breached the SPA, but instead emphasizes the materiality and earlier timing of the Nonexempt Shareholders' breaches and of the alleged article 2 breaches by all Shareholders. With regard to the timing of the respective breaches actually found by the jury in question 1, even if we agree with WCW that its breach date was October 31, 2008, we cannot agree that there is no evidence or merely a scintilla of evidence that WCW breached first, as found by the jury in question 2. The SPA initially required WCW to pay the initial consideration of $4.6 million and deliver the $3.8 million dollar LOC on July 16, 2008—the SPA's designated closing date for "the consummation of the sale and purchase of the Stock." The Nonexempt Shareholders' obligation to pay their Spectrum loans back in section 1.4 was expressly tied to "closing." However, there is more than a scintilla of evidence from which a reasonable jury could conclude that this "closing" date was pushed back to when WCW and Shareholders entered into the amendment, and effectively pushed back even further to October 31, 2008, the date when the amendment required WCW to pay the last installment on the initial consideration and provide the LOC. In other words, the Nonexempt Shareholders would not be required to pay back their officer loans—

10

according to Broussard,[5] they were going to be "offset against the money that was owed to us"—until WCW fulfilled its "closing" requirements.

Moreover, the jury also determined that the Nonexempt Shareholders' failures to comply with the SPA were excused in question 3. Within a "Failure to Comply/Excused Instruction," expressly linked to questions 2 and 3, the jury was instructed that a failure to comply must be material and was provided with the *Mustang Pipeline* factors. The jury also was instructed that a failure to comply by one party is excused by the other party's previous failure to comply with a material obligation of the same agreement. Thus, under the charge as given, the jury could conclude that a failure to comply with the SPA was excused where the other party materially breached first or where that failure to comply was not "material."[6] We already have determined that the evidence was legally sufficient to support the jury's finding that WCW breached first. Further, based on the amount of the four unpaid officer loans, in the amount of $11,551 each, the jury reasonably could have concluded that the circumstances weighed in favor of the Nonexempt Shareholders' failures to comply not being material. WCW was deprived of a benefit of approximately $46,000 in unpaid loans due; WCW was obligated to pay Shareholders a substantially larger amount in initial consideration of $4.6 million cash so the due and owing amounts reasonably could have been offset and the failures thus cured; the Nonexempt Shareholders stood to forfeit significant percentages of ownership in Spectrum (over 90%) if their failures to pay back their loans were treated as material; and the failure to pay back $46,000 when the

---

[5] Broussard was the majority Shareholder in Spectrum.

[6] In a footnote, WCW and Wilmot attempt to argue because there is no evidence that WCW committed a prior material breach (one of Shareholders' defensive theories), there is a *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000), problem within question 3 warranting a new trial. However, *Casteel* does not apply where, as we conclude here, such theory was not improperly submitted. *Id.* at 389.

11

purchase price for Shareholders' companies was for a total of $11.2 million, including initial consideration in cash of $4.6 million, does not strongly offend standards of good faith and fair dealing. *See Mustang Pipeline*, 134 S.W.3d at 199; *see also Hernandez*, 875 S.W.2d at 693–94 (extent to which party prejudiced by breach factors into materiality).

Finally, the evidence does not conclusively prove WCW's affirmative defense of prior material breach as a matter of law; i.e., that all the Shareholders materially breached the SPA on July 16, 2008, or otherwise before WCW, by their alleged failures to comply with various disclosure and representation requirements.[7] The jury only found that the Nonexempt Shareholders breached the SPA.[8] Moreover, the charge instructed the jury that a failure to comply must be material, and is excused by the other parties' previous failure to comply with a material obligation of the same agreement. And the jury found that WCW's failure to comply with the SPA was not excused in question 3.

WCW and Wilmot primarily argue testimony from their expert witness, CPA Scott Bayley, that Shareholders' financial statements failed to comply with multiple GAAP standards conclusively proves they breached section 2.8[9]; a

---

[7] WCW and Wilmot assert that Shareholders' prior material breaches also require a take-nothing judgment in WCW's favor on the Notes.

[8] WCW and Wilmot contend that Shareholders conceded they committed a breach but only disagree as to materiality. We disagree. Shareholders argue first that they committed no breach, and "even if any technical breach is found," that it was not material.

[9] Specifically, WCW and Wilmot point to Bayley's testimony that use of the term "gross revenues" in Spectrum's financial statements was not in accordance with GAAP because project write downs were not separately deducted as a line item; the statements were not accompanied by statements of cash flows and notes to financial statements as required by GAAP; Spectrum recorded contingent receivables with respect to client N.A. Water Systems ("NAWS") not permitted by GAAP; there was "no confirmation that the company's financial statements have been prepared in accordance with Generally Accepted Accounting Principles" because they were not audited by an independent CPA and R. Laborde, Spectrum's CFO, was not a CPA; and the statements failed to properly reserve for litigation and bad debt liabilities with respect to clients

threatening letter from one of Spectrum's major clients, NAWS, conclusively proves Shareholders breached section 2.13; Shareholders' failure to list any "unresolved customer disputes" conclusively proves they breached section 2.14 in light of Spectrum's disputes with three of its largest clients, Enterprise Products, Baker Petrolite, and NAWS; Bayley's testimony regarding Spectrum's accounts receivable as not being in accordance with GAAP and being overstated conclusively proves they breached section 2.15; Broussard's testimony regarding broker Tim Barfield conclusively proves they breached section 2.27; and the evidence that Shareholders omitted material facts in making their representations and disclosures and falsely represented there were no undisclosed facts that would have an adverse effect on the value of Spectrum conclusively proves they breached sections 2.29 and 2.30.

Because WCW had the burden to establish prior material breach, we first examine the record for evidence supporting the jury's finding that WCW's failure to comply was not excused due to Shareholders' prior material breach, while ignoring all contrary evidence. *See Dow Chem.*, 46 S.W.3d at 241. If there is no evidence to support the finding, then we examine the entire record to determine whether Shareholders' prior material breach is established as a matter of law. *See id.* We conclude WCW has not met its burden to conclusively establish that Shareholders committed a prior material breach. *See id.*

With regard to Spectrum's financial statements, section 2.8 states that the provided statements are "unaudited" but that they "are true and correct in all material respects and, taken as a whole, fairly present, in accordance with [GAAP] consistently applied, the financial position of the Company as of the dates

NAWS and Baker Petrolite in accordance with GAAP. Bayley also testified that adherence to GAAP is "important" to buyers of companies essentially so they can understand what they are purchasing.

indicated." Through WCW's team's own due diligence process, WCW and Wilmot were aware of Spectrum's "unaudited and unreviewed financial statements." Through retained due diligence examiner PKF's report, WCW and Wilmot were aware that "[t]he Company's books have not been audited or under gone a review by a CPA." WCW and Wilmot also were aware that Spectrum's financial statements were not consistent with GAAP in certain respects. Although WCW had not engaged PKF to perform a full audit of Spectrum's financials, PKF reported that some of Spectrum's journal and adjusted journal "descriptions/entries are not standard accounting terminology/practices" and "[t]here were a few accounting terms and entries used by the Company that are inconsistent with the profession's standards." At trial, Ramey testified regarding his impression of Spectrum's financial records:

> A. . . . They had some issues with some of the naming of the accounts, but we worked through those issues. And as soon as I know what they are just translate them to what that would be in normal practice.
>
> Q. So, some of this terminology was different than what you were used to?
>
> A. Right.
>
> Q. But once you understood the terminology?
>
> A. Then I was fine.

When asked whether Spectrum's accounting procedures were "not up to GAAP" and had "certain GAAP problems," Ramey stated: "There are with like three or four just the name on the accounts were different or unique and that is okay. We work around that." Specifically, with regard to accounts receivable and bad debts, PKF reported that "Spectrum does not use an Allowance for Doubtful Accounts methodology," but instead immediately writes off accounts when it deems them uncollectible. PKF reported that "[a]ccounting appears to be at the proper level of

14

detail" and "appears to be appropriate to provide management with information to make business decisions." PKF also reported that through May 30, 2008, Spectrum's financials reflected reserved "write-offs" in the amount of $1,301,000 for "two major projects" for clients NAWS and Baker Petrolite. Finally, within schedule 2.10(d)[10] attached to the SPA, Shareholders disclosed "two projects with budget issues which will result in unbilled costs" for clients NAWS and Baker Petrolite. Shareholders disclosed that these budget issues "are the result of quality problems (rework), poor project management, manpower shortages, clients' refusal to accept change orders and low initial engineering estimates." This schedule disclosed that through May 2008, Spectrum's financial statements reflected write downs of $1,301,000; additional write downs of approximately $139,000 would be reflected in Spectrum's June 2008 financial statement. At trial, Wilmot acknowledged that he knew about these two write down reserves for NAWS and Baker Petrolite when he signed the SPA, but they were "not significant" and "not a big deal." Thus, there is evidence Shareholders disclosed that Spectrum's financial statements were not audited and WCW was aware of that; WCW was aware that Spectrum's financials had GAAP problems, particularly with how receivables and bad debt were recorded; despite these problems, Spectrum's financials were appropriately detailed to allow for business decisions; Shareholders disclosed write down reserves on two significant projects; and WCW was aware of those reserves, but Wilmot was not concerned. Viewing the evidence in the light most favorable to the verdict, we find there is legally sufficient evidence from which a reasonable jury could have found that WCW was not excused by any prior material breach by Shareholders of section 2.8. *See id.*

_____

[10] WCW and Wilmot do not argue that Shareholders breached section 2.10 of the SPA, Absence of Certain Changes or Events. In section 2.10, Shareholders made representations about the absence of changes with respect to, e.g., commencement of litigation, liabilities not disclosed in the financial statements, and accounting methods.

15

With regard to litigation, section 2.13 states that "[t]here are no actions, claims, suits, investigations, inquiries or proceedings pending against the Company or *in rem* against any of the Assets, or to the knowledge of the Company or any Seller threatened . . . at law or in equity, in any court, or before or by any Governmental Body." Broussard testified that as of the execution of the SPA and the amendment, Spectrum had not received any demand for arbitration or any intent to file arbitration from NAWS. By the time Broussard left Spectrum in mid-November 2008, there had not been any arbitration filed. It was not until November 25, 2008 that Spectrum filed a demand for arbitration against NAWS. There was testimony from Ed Laborde, who participated in drafting the SPA, agreeing that such November 2008 arbitration and NAWS' later counterclaim would not be "pending" as of July or September 2008. Moreover, aside from noting the budget issues and the write down reserves for the NAWS project, Shareholders attached to schedule 2.10(d) of the SPA over 50 pages relating to the project. This included correspondence between NAWS and Spectrum concerning "several issues" regarding the project they were working on for their client Marathon. Within its letter, NAWS agreed if Spectrum felt it necessary that Spectrum could initiate dispute resolution procedures against NAWS to advance its position on certain change orders. However, NAWS indicated it wanted to cooperate "to get this relationship and Work back on track." Spectrum agreed, "The issues can be resolved if we work together." According to Broussard, "What we knew at that time is what we put in [the schedule]." Viewing the evidence in the light most favorable to the verdict, we find there is legally sufficient evidence from which a reasonable jury could have found that WCW was not excused by any prior material breach by Shareholders of section 2.13. *See id.*

16

With regard to customers and suppliers, section 2.14 states that "[t]he relationships of the Company with the Largest Customers and Suppliers are good, and except as set forth on Schedule 2.14 there are no unresolved disputes with any of such Largest Customers and Suppliers." In addition to the budget issues and write down reserves with NAWS and Baker Petrolite disclosed in schedule 2.10(d), Shareholders also disclosed that they were having a "design issue regarding hydrostatic test pressures" on a project for Enterprise Products, such that they had informed their professional liability insurance agent. Shareholders attached the email to their agent from Kernion, who described the issue as "troubling." Broussard also forwarded Abe Fatemizadeh this email in conjunction with their discussions about this Enterprise Products project. According to Broussard, for several months prior to the July closing, he discussed the NAWS, Baker Petrolite, and Enterprise Products project issues with Abe because Abe was WCW's agent and "pointman" who was going to take Broussard's place as president of the new company. WCW and Wilmot also were aware, through PFK's diligence efforts, that because Enterprise Products comprised over 70% of Spectrum's 2007 revenue, there was a "high risk of revenue collapse if Enterprise finds another service provider" and that by May 2008, Spectrum's revenue stream from Enterprise Products had declined to 27.5%. They were aware through WCW's diligence efforts that Enterprise Products presented "[v]olatile business" and had recently undergone "[k]ey management change" with "[u]nknown effect." Broussard wanted to "flag" the change for WCW because the new management might not provide Spectrum with as much work. When Broussard left Spectrum in mid-November 2008, Enterprise Products had not made any complaint, formal or informal, about the design issue. Enterprise Products did not stop doing business with Spectrum until 2009. Baker Petrolite did not file suit against Spectrum until March 2010; Ed Laborde agreed that a lawsuit filed in 2010 likely was not

17

"pending" in 2008; Broussard and Borel stated that in 2008 they did not know Baker Petrolite would file suit; and Borel stated Baker Petrolite had not made any claim by the time he left Spectrum in September 2009. Viewing the evidence in the light most favorable to the verdict, we find there is legally sufficient evidence from which a reasonable jury could have found that WCW was not excused by any prior material breach by Shareholders of section 2.14. *See id.*

With regard to accounts receivable, section 2.15 states that "trade and other accounts and notes receivable of the Company which are classified as current assets on the Financial Statements or are listed on Schedule 2.15A are *bona fide* receivables, are stated in accordance with GAAP and are fully collectible, subject to the reserve for doubtful accounts reflected in the Financial Statements." The evidence detailed above indicates Shareholders had disclosed $1,450,000 in write down reserves through June 30, 2008; WCW and Wilmot also were aware that Spectrum's treatment of their receivables had GAAP issues; and Wilmot testified that such write downs were not a "big deal." In addition, Broussard and R. Laborde verified that Spectrum had disclosed all anticipated receivable reserves as of the July closing. Viewing the evidence in the light most favorable to the verdict, we find there is legally sufficient evidence from which a reasonable jury could have found that WCW was not excused by any prior material breach by Shareholders of section 2.15. *See id.*

In a footnote, WCW and Wilmot make their arguments with regard to how the evidence conclusively shows Shareholders breached sections 2.27, 2.29, and 2.30 of the SPA. With regard to section 2.27 on brokers/advisors, there is evidence that WCW was aware Barfield represented Shareholders in the negotiations.[11] In

_____

[11] Communications between Broussard and WCW/Bouknight during December 2007 and January 2008 resulting in WCW/Wilmot's letter of intent occurred via Barfield. WCW's due diligence team shared their February 2008 findings with Broussard *and* Barfield, which Wilmot

18

any event, WCW has not conclusively proven the vital fact that it suffered damages due to any section 2.27 breach. With regard to section 2.29 on due diligence information and section 2.30 on disclosure schedules, WCW and Wilmot cumulatively rely on the same evidence of the other alleged breaches. However, we already have found that WCW has not met its burden to conclusively establish that Shareholders committed a prior material breach with regard to these respective sections. Therefore, viewed in the light most favorable to the verdict, we find there is legally sufficient evidence from which a reasonable jury could have found that WCW was not excused by any prior material breach by Shareholders of section 2.27, 2.29, or 2.30. *See id.*

We overrule WCW and Wilmot's first issue.

## B. Lack or complete failure of consideration

### 1. WCW and Wilmot did not prove as a matter of law that Spectrum had no value at the time of sale.

As part of their second issue, WCW and Wilmot argue that the only legally sufficient and unrebutted evidence of Spectrum's value when WCW took control, based on Ramey's testimony, was that Spectrum was worthless, with a negative EBITDA of -$182,506. Thus, because Spectrum had no actual value, there was a lack or complete failure of consideration and the SPA was unenforceable.

Shareholders respond that WCW did not meet its burden to prove this affirmative defense. To prove total failure of consideration, WCW had to, and did not, conclusively prove that Spectrum's stock, representing an operational engineering firm with assets, clients, and projects, was worthless at the time of purchase. We conclude that WCW has not met its burden to show a lack or

acknowledged.

19

complete failure of consideration.

Generally, a contract must be supported by consideration to be enforceable. *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 335 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 659 (Tex. 2006)). Consideration consists of either a benefit to the promisor or a detriment to the promisee. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). It is a present exchange bargained for in return for a promise. *Id.* It may consist of some right, interest, or profit, or benefit that accrues to one party, or, alternatively, of some forbearance, loss or responsibility that is undertaken or incurred by the other party. *Angelou v. African Overseas Union*, 33 S.W.3d 269, 280 (Tex. App.—Houston [14th Dist.] 2000, no pet.). The rule is well settled in Texas that the burden of proving a want or failure of consideration is upon the pleader. *Rodriguez v. Sw. Drug Corp.*, 619 S.W.2d 469, 472 (Tex. Civ. App.—Houston [14th Dist.] 1981, no writ); *see Kish v. Van Note*, 692 S.W.2d 463, 467 (Tex. 1985) (op. on reh'g) (citing Tex. R. Civ. P. 94); *McLernon*, 347 S.W.3d at 335 (same). "The burden rests upon the party alleging lack of consideration to prove the same because of the general rule a written contract is presumed to be supported by consideration." *Rodriguez*, 619 S.W.2d at 472; *see McLernon*, 347 S.W.3d at 335. However, parol evidence may be used to show want or failure of consideration. *McLernon*, 347 S.W.3d at 335 (citation omitted).

Here, the presumption of consideration applies. *See id.* ("[A] written instrument reciting a consideration imports one, and with such a recitation we presume the consideration [to be] sufficient."). The SPA expressly recites:

> WHEREAS, Sellers, in the aggregate, own 9,800 shares (the "Shares") of the no par value common stock of each of Spectrum Engineering, Inc. and Spectrum Services, Inc., respectively (the "Stock"") [sic]) constituting all of the issued and outstanding Shares of

20

the Stock; and

WHEREAS, Buyer desires to acquire from the Sellers, and Sellers desire to sell, all of said Shares upon and subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual premises, covenants and agreements set forth herein and in reliance upon the representations and warranties contained herein, the parties hereto covenant and agree as follows . . . .

The amended SPA recites:

WHEREAS, the parties desire to amend the Stock Purchase Agreement dated as of July 16, 2008 (the "Stock Purchase Agreement"), pursuant to which, among other things, the Buyer has agreed to acquire the Company;

WHEREAS, the parties desire to amend the Stock Purchase Agreement as set forth below:

NOW, THEREFORE, in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows . . . .

There is no dispute that the agreed purchase price for Spectrum's stock was based on a four-times multiple of Spectrum's end-of-2007 EBITDA, which was $2.8 million.[12] The parties also generally agree that somewhere between three- or four-times to six-times EBITDA would be in the "typical" range for valuation on a purchase of an engineering company of Spectrum's size.

To succeed on this issue, WCW and Wilmot must demonstrate that they conclusively proved their affirmative defense of lack or complete failure of

---

[12] In addition to the initial consideration of $4.6 million and the deferred consideration of $3.8 million, the SPA also provided that, if Spectrum's EBITDA at the end of 2010 equaled or exceeded $2.8 million, WCW was to pay $2.8 million to Shareholders as earnout consideration on or before February 28, 2011. If Spectrum's end-of-2010 EBITDA was less than $2.8 million, WCW would reduce the payout of earnout consideration accordingly.

consideration as a matter of law. *See Roark*, 813 S.W.2d at 495. They must conclusively rebut the presumption of consideration and conclusively establish that Shareholders provided no consideration to support the SPA. *See Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 319 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *Rodriguez*, 619 S.W.2d at 472. Because WCW and Wilmot had the burden at trial and because they challenge the legal sufficiency of the evidence in this appeal, they bear the appellate burden to show "that the evidence establishes, as a matter of law, all vital facts in support of the issue." *See Dow Chem.*, 46 S.W.3d at 241.

WCW and Wilmot argue that Spectrum had a negative value when WCW took control. They rely on Ramey's testimony that Spectrum's financials showed a negative EBITDA of -$182,506. However, Ramey calculated this figure based on Spectrum's financials for the entirety of 2008—that is to say, he provided Spectrum's end-of-2008 EBITDA. Ramey did not provide any testimony that Spectrum's end-of-2007 EBITDA of $2.8 million, to which he had provided adjustments during the negotiations that resulted in its reduction, was incorrect. Nor did he provide any testimony as to Spectrum's EBITDA as of July 16, 2008, or as of sometime in late September 2008, when the amendment was signed and, according to Wilmot, WCW had "assumed ownership and management of the company."[13] Bayley also did not testify regarding Spectrum's EBITDA at the time of closing or takeover. Bayley testified that he recalled Spectrum's EBITDA figures for 2007 in the "neighborhood" of $2.8 million, and agreed that 2007 had been a "profitable year" for Spectrum. He also stated that Spectrum had "positive"

---

[13] Quick calculation of Spectrum's 2008 EBITDA through June (month before July closing) and through August (month before September takeover), based on the same 2008 balance sheet and using the exact same formula used by Ramey during his testimony, yields positive figures. Perhaps this explains why Ramey was not cross-examined except as to end-of-2008 EBITDA.

cash flows through the end of 2008. Bayley did not opine that Spectrum had no value as of July or September 2008; instead, he opined that Spectrum's value then was less than the purchase price of $11.2 million. There also was evidence that, in late 2007, the other Shareholders offered to "internally" buy out Broussard based on a $4.8 million valuation and there was a valuation associated with a potential "strategic" offer by third party Energy Allied of $8.7 million.[14] Further, there was evidence that by November 2008, the financial markets had "crashed."

Based on the trial evidence, viewed in the light most favorable to the verdict, we conclude that WCW has failed to overcome the presumption of consideration and has failed to meet its burden to conclusively establish its affirmative defense that the SPA lacked consideration. *See id.*[15]

## 2. The trial court did not abuse its discretion in refusing WCW's requested valuation questions.

Next, WCW contends that at the least it should be granted a new trial because the trial court refused to submit WCW's proffered jury questions on the value of Spectrum. Here, WCW requested that the jury be asked to find "the value of" the respective Spectrum companies as of July 16, 2008 and as of September 25,

---

[14] WCW and Wilmot contend such evidence of valuation is incompetent because it was speculative and based on lay testimony. However, WCW still bears the burden to conclusively prove want of consideration, and even discounting such evidence, there is no evidence that Spectrum was completely worthless at takeover. Moreover, both CPA Ramey and CPA Bayley testified as to Spectrum's end-of-2007 EBITDA, the agreed basis of valuation for the SPA.

[15] WCW's cited cases do not advance its position. Unlike in *Kish*, here, there is not "ample" evidence that Spectrum was not "functional" and "worthless" at closing, and at the time of transfer, WCW took over a functioning engineering firm with clients, projects, and still positive cash flows. *Cf.* 692 S.W.2d at 465, 467. In *Anderson Machine Co. v. Harber*, the appeals court in fact did not find total failure of consideration as a matter of law where the purchaser had made some use of the scraper machinery at issue. 584 S.W.2d 480, 482 (Tex. Civ. App.—Austin 1979, no writ). And unlike in *Worm v. Huffman*, here, there was no conclusive evidence that Spectrum was completely "unfit" at the time of takeover. *Cf.* 244 S.W.2d 899, 900 (Tex. Civ. App.—San Antonio 1951, writ ref'd n.r.e.).

2008.[16] The trial court refused the submission.

Whether consideration is adequate or fails is a question of law for the court. *Hall v. Hubco, Inc.*, 292 S.W.3d 22, 28 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *Schepps Grocery Co. v. Burroughs Corp.*, 635 S.W.2d 606, 608 (Tex. App.—Houston [14th Dist.] 1982, no writ). Where appropriate, a trial court may base its legal determination on lack or failure of consideration on underlying facts as found by the jury. *Schepps*, 635 S.W.2d at 608 (not improper to submit jury question "as to whether appellee failed to provide the necessary service and parts to maintain the computer in good operating condition"—trial court may have decided there was enough evidence to submit issue). However, ultimately it is "the duty of the court (not the jury) to determine whether there was a failure of consideration." *Id.* As detailed above, we already have concluded WCW and Wilmot failed to prove that Spectrum had no value at the time of sale or transfer such that the SPA lacked consideration as a matter of law.

WCW relies on rule 278 in arguing that the trial court abused its discretion in refusing to submit its valuation questions. Rule 278 requires trial courts to submit questions that are properly raised by the pleadings and the evidence. *See* Tex. R. Civ. P. 278. However, WCW has not provided, and we have not located, any case applying rule 278 to *require* submission of an underlying fact question on the legal question of consideration in this precise context. Assuming solely for purposes of our analysis that rule 278 applies, a trial court may properly refuse to submit a question to the jury if no evidence exists to warrant its submission. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or

---

[16] Although not raised by the parties, these requested questions misplaced the burden of proof. Appropriate questions would have asked whether Spectrum had no value at the time of closing.

suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). Although its requested questions asked about the value of Spectrum as of July and September 2008, the precise fact issue that WCW was required to raise to show lack or complete failure of consideration was the complete absence of Spectrum's value at these times. That is, WCW needed to present some evidence such that reasonable jurors could answer the requested questions with "$0.00." Even viewing the evidence and inferences in the light most favorable to WCW, and disregarding evidence and inferences to the contrary, *see Elbaor*, 845 S.W.2d at 243, evidence of Spectrum's end-of-2008 EBITDA at best only creates a "mere suspicion" that Spectrum was entirely worthless five and a half months earlier at closing or three months earlier at takeover.[17] *See Kindred*, 650 S.W.2d at 63. Thus, we reasonably construe the trial court's statement during the charge conference—"Refused. There is no evidence of the value of SCI or SSI . . . ."—to mean it was ruling that there was no evidence of the lack of Spectrum's value on those dates.

Therefore, we conclude that the trial court did not abuse its considerable discretion or act without regard to guiding principles in refusing the submission. *See Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g); *4901 Main, Inc. v. TAS Auto., Inc.*, 187 S.W.3d 627, 633, 635 (Tex. App.— Houston [14th Dist.] 2006, no pet.) (citing rule 278 and *Elbaor*, 845 S.W.2d at 243, in concluding that trial court did not abuse discretion in refusing to submit proposed jury questions where no evidence warranted submission).

We overrule WCW and Wilmot's second issue.

---

[17] WCW and Wilmot insist that Shareholders conceded a factual dispute on Spectrum's "worthlessness." We disagree. Shareholders expressly argued that "there is no evidence" Spectrum's value was negative when WCW took control.

## C. Shareholders are not limited to $500,000 in damages for WCW's SPA breach.

In their third issue, WCW and Wilmot argue that the indemnification provisions in the SPA unambiguously limit and cap any breach damages at $500,000. They specifically point to section 9.2, Indemnification of Seller Indemnitees, which provides:

> Buyer agrees to defend, indemnify and hold Seller Indemnitees (as defined below) harmless from and against all Damages arising out of, based upon or resulting from:
>
> A. any misrepresentation, breach of representation or warranty on the part of Buyer under the terms of this Agreement;
>
> B. any nonfulfillment of any covenant or agreement on the part of Buyer under the terms of this Agreement; and
>
> C. the unlawful conduct of the operations and business of the Company or the ownership of the Assets on or after the Closing Date.

They also point to section 9.4, Limitations on Indemnification, which, in pertinent part, provides:

> B. The indemnification provided for in Section 9.2 hereof shall be subject to the following limitations:
>
> . . .
>
> (2) The Sellers shall not be entitled to indemnification from Buyer under Section 9.2 in excess of Five Hundred Thousand Dollars ($500,000).

And they point to section 9.6, Exclusive Remedy, which provides: "The indemnity provided in this Article 9 shall be the exclusive remedy with respect to a breach of the matters contained in this Agreement." WCW and Wilmot highlight the ability of sophisticated parties to limit liability between themselves through the use of indemnity provisions. According to WCW and Wilmot, section 9.2's text is broad

and encompasses damages caused by WCW itself on a breach of the SPA, and section 9.4B unambiguously limits Shareholders' damages to $500,000. WCW and Wilmot contend the trial court erred by refusing their request to disregard the jury's answer to question 15 (damages per Shareholder resulting from WCW's SPA breach) and instead apply article 9's cap.

Shareholders respond that WCW's interpretation of the indemnity provisions is not one to which the provisions are reasonably susceptible. In particular, they contend the parties' intent—prior to application of the limiting indemnity rights of the SPA—was that WCW be required to pay Shareholders $4.6 million in initial consideration and secure the deferred consideration with a $3.8 million LOC by closing, or by the dates provided in the amendment, in exchange for Spectrum's stock, and WCW failed to do so. According to Shareholders, limiting WCW's subsequent liability to them for such a breach to a maximum of $500,000 without payment of the initial consideration and delivery of the LOC is not a reasonable interpretation of the indemnity clause.

"The interpretation of an unambiguous contract is a question of law, and we review a trial court's interpretation de novo." *Weaver v. Jamar*, 383 S.W.3d 805, 810 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Our primary concern is to "ascertain the true intentions of the parties as expressed in the instrument." *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 63 (Tex. 2014) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). To discern the parties' intent, we must examine the entire contract in an effort to harmonize and give effect to all provisions so that none will be rendered meaningless. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). "We presume the parties to the contract intended every clause to have some effect." *Weaver*, 383 S.W.3d at 810 (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121

(Tex. 1996)). Further, we "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam). If the written instrument is worded so that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and we will construe the contract as a matter of law. *J.M. Davidson*, 128 S.W.3d at 229; *Coker*, 650 S.W.2d at 393.[18]

If we were to read article 9's provisions in isolation, then such "indemnification" might appear broad enough to encompass the instant breach of the SPA by WCW. However, the Texas Supreme Court consistently has cautioned against ignoring pertinent language in contracts. *See Frost Nat'l Bank*, 165 S.W.3d at 313 (court of appeals "ignored pertinent language" in lease schedule at issue); *see also FPL Energy*, 426 S.W.3d at 64 ("We cannot interpret a contract to ignore clearly defined terms . . . ."). We cannot give a single provision taken alone controlling effect, but rather must consider all the provisions with reference to the whole instrument. *J.M. Davidson*, 128 S.W.3d at 229. When we consider the PSA as a whole, as we must, *see id.*, we first note that within section 1.2, Purchase Price, the PSA provides for a total purchase price of $11.2 million to be paid by WCW for the Spectrum stock.

The PSA makes clear that one essential component of the $11.2 million purchase price was $4.6 million in "Initial Consideration." Section 1.2A, Initial Consideration, provides:

> Buyer shall pay to Sellers the aggregate amount of Four Million
> Six Hundred Thousand Dollars ($4,600,000) (the **"Initial**

---

[18] Neither party contends that the SPA is ambiguous.

**Consideration"**), allocated among Sellers in accordance with **Schedule 1**[19]**;** provided that (i) Two Hundred Fifty Thousand Dollars ($250,000.00) shall be paid on or before September 24, 2008, (ii) Two Hundred Fifty Thousand Dollars ($250,000.00) shall be paid on or before October 8, 2008, and (iii) Four Million One Hundred Thousand Dollars ($4,100,000) shall be paid on or before October 31, 2008, which due date shall be automatically extended for the duration of any Unavoidable Delay, however in no event shall the due date be extended beyond November 15, 2008. The payment of the balance of the Initial Consideration shall be guaranteed by Chris Wilmot and shall be evidenced by a continuing guarantee in the form attached as Exhibit A-I[.]

(Emphases in original). Another vital component of the purchase price was $3.8 million in "deferred consideration" to be paid to Shareholders pursuant to the Notes. Section 1.2B, Deferred Consideration, defines the term as "the aggregate amount of Three Million Eight Hundred Thousand Dollars ($3,800,000)." Section 1.2B additionally provides that the deferred consideration would be "allocated among Sellers in accordance with **Schedule 1**, in three annual payments"; "[t]he Deferred Consideration due each Seller shall be evidenced by a promissory note," which "Note(s) shall be secured by a letter of credit"; and "the Buyer shall deliver the Security for the Deferred Consideration on or before October 31, 2008 . . . . The delivery of the Security shall be guaranteed by Chris Wilmot and shall be evidenced by a continuing guarantee in the form attached as Exhibit A-I." The parties to the SPA recognized that payment of the initial consideration, and securing payment of the deferred consideration, to the Shareholders was so crucial as to warrant a guaranty by Wilmot.

---

[19] Schedule 1 to the PSA specifically details, per Shareholder, the precise amount of consideration, including initial and deferred, that each would receive in exchange for his number of Spectrum shares.

The SPA further reflects the importance of the requisite payment of the initial consideration to the parties' business transaction by requiring that WCW pay the initial consideration "[a]t the Closing." Section 1.6, Closing, provides:

> Subject to the terms and conditions hereof, the consummation of the sale and purchase of the Stock provided for herein (the **"Closing"**) shall take place on July 16, 2008 and shall be deemed effective at 11:59 p.m. CST on such date (the **"Closing Date"**) at the offices of Winstead PC, in Houston, Texas, or at such other place or time upon which Buyer and Sellers may agree in writing. . . . At the Closing, Buyer (or an affiliate of Buyer acting on Buyer's behalf) shall pay the Initial Consideration by wire transfer in immediately available funds in accordance with the wiring instructions to be provided as contemplated in Section 1.2A.

(Emphases in original). Section 1.2B also provides that the Notes, as secured by the LOC, were "to be delivered to each Seller at Closing." And, in consistent fashion, the pertinent portion of article 7, Closing Deliveries of Buyer, provides:

> Except as may be waived in writing by Sellers, Buyer shall deliver the following to Sellers at the Closing;
>
> . . .
>
> **7.2 Purchase Price**
>
> Buyer shall deliver the Initial Consideration as contemplated in Section 1.6 and the Notes and Security as contemplated in Paragraph 1.2.B.

Finally, within article 5, Covenants of Buyer, section 5.3, Certain Acts or Omissions, expressly provides: "Buyer shall satisfy all conditions to Closing imposed on Buyer set forth in this Agreement." These provisions consistently contemplate WCW's payment of the initial consideration and securing of the Notes as "conditions" to the business transaction's closing. Moreover, although section 1.5, discussed further below, provides for later potential adjustment downward or

30

nonpayment of the deferred consideration in certain situations, it does not apply to payment of the $4.6 million in initial consideration or to delivery of the LOC.[20]

On the whole, the PSA thus makes clear that it was the core intent of the parties for WCW to pay the initial consideration of $4.6 million cash and provide a $3.8 million LOC to secure the deferred consideration at closing in exchange for the Shareholders' turning over Spectrum's stock. Applying WCW's interpretation of the indemnity provisions—that they apply to WCW's breach for failure to meet these set-out, detailed, integral "consideration" prerequisites to its acquisition of the Shareholders' stock—could result in WCW's effectively being able to purchase Spectrum for the sum total consideration of $500,000, rendering multiple provisions of the PSA meaningless. *See FPL Energy*, 426 S.W.3d at 69. Bearing in mind that our primary goal is to ascertain the intent of WCW and Shareholders when they entered into the PSA, we find such a construction unreasonable. *See Frost Nat'l Bank*, 165 S.W.3d at 313.

In contrast, interpreting the PSA's indemnity provisions as not applying to WCW's requisite payment of the initial consideration and securing of the LOC "does not conflict with, or render meaningless, any other provision of the [PSA]." *See FPL Energy*, 426 S.W.3d at 68. This is because the indemnity provisions, as harmonized, would still be applicable to WCW's "nonfulfillment" of any of its other covenants or agreements under the PSA, e.g., any failure in connection with obtaining required governmental approvals or third-party consents for the transaction (section 5.1) or any failure to comply with or disclose information in connection with applicable legal requirements (section 5.2).

---

[20] As mentioned earlier, the SPA also provides for later potential adjustment downward of the $2.8 million WCW was to pay in earnout consideration. *See supra* note 12.

Because there is only one reasonable interpretation, we conclude as a matter of law that the PSA is unambiguous and the indemnification provisions do not apply to, and Shareholders are not required to indemnify WCW for damages from, WCW's breach of the SPA by failing to pay the initial consideration and failing to supply the LOC. *See Frost Nat'l Bank*, 165 S.W.3d at 313. Thus, the trial court did not err in refusing to apply article 9.

Alternatively, WCW and Wilmot argue that no evidence supports the jury's finding of collective breach damages of over $3 million for WCW's SPA breach. However, rather than argue their position based on the trial evidence, they rely on their unreasonable construction of the indemnification provisions. To the extent their argument presents a challenge to the legal sufficiency of the evidence supporting the jury's award of breach damages in the amount of $3,053,792.90, we disagree. Here, the SPA and amendment required WCW's payment of initial consideration in cash of $4.6 million. The evidence shows that WCW made only three payments toward the initial consideration, totaling $1.5 million. The jury's award indicates that it divided the remaining balance of $3.1 million among the Shareholders based on their respective ownership percentages and that it offset for the unpaid loans of the Nonexempt Shareholders—all within a margin of error of about 1% for each Shareholder. Viewing the evidence in the light most favorable to the verdict and indulging every reasonable inference, we conclude that a reasonable and fair-minded jury could award this amount of damages for WCW's breach of the SPA. *See City of Keller*, 168 S.W.3d at 827.

We overrule WCW and Wilmot's third issue.

## D. Shareholders are not limited in their breach recoveries under the Notes.

In their fourth issue, WCW and Wilmot assert there is legally insufficient evidence to support any breach or damages findings as to the Notes claims of

certain Shareholders, and that the evidence conclusively proves that that any failure to pay on the Notes was excused, contrary to the jury's finding in question 5. With regard to Broussard, Kernion, and R. Laborde, WCW and Wilmot contend because these Nonexempt Shareholders resigned without "good reason," they forfeited any unpaid amounts on their Notes under section 1.5 of the SPA.[21] Also, WCW and Wilmot argue that, at a minimum, under section 1.2B,[22] because

---

[21] Section 1.5, Purchase Price Adjustment for Termination of Employment, in relevant part, provides:

> A. <u>Adverse Termination</u>.
>
> Following the Closing Date, should the employment of any Seller designated as "Nonexempt" on Schedule 1 be terminated (a) by Resignation or (b) by Buyer for Cause in either case, (an "Adverse Termination"), such Seller shall forfeit all rights to receive any unpaid Deferred Consideration, Earnout Consideration and Bonus Consideration as of and following the effective date of the Adverse Termination.
>
> B. For purposes of this Agreement:
>
> . . .
>
> (2) the term "Good Reason" means the termination of a Seller's employment with the Company or its affiliates by the Seller by reason of (i) the Company's or any of its affiliates (including the Buyer after the Closing Date) material breach of this Agreement or any employment agreement to which Seller is a party after two (2) written notices and opportunity to cure has been given by such Seller affected . . . . .

[22] Section 1.2B of the SPA, Deferred Consideration, provides:

> Buyer shall pay to Sellers the aggregate amount of Three Million Eight Hundred Thousand Dollars ($3,800,000) (the "Deferred Consideration"), allocated among Sellers in accordance with Schedule 1, in three annual payments following the Closing pursuant to the payment schedule specified below; *provided, however, that* in the event that any Nonexempt Seller (as identified on Schedule 1) other than Jerry W. Broussard ("Broussard") is not employed by Company as of the date that is one (1) year after the Closing Date for reason of (i) voluntary resignation by Seller without Good Reason (as defined below) ("Resignation") or (ii) termination of said Seller's employment by Buyer for Cause (as defined below), the Deferred Compensation otherwise due such Seller in accordance with Schedule 1 shall be forfeited by such Seller and retained by

33

Kernion, R. Laborde, and Strickland were not employed as of the dates the second and third Note installments came due, they forfeited these later payments. Finally, with regard to Broussard, WCW and Wilmot argue that, under section 1.2B, Broussard's Notes damages must be reduced by the amount of the Notes payable to the Exempt Shareholders (Borel, Giron, Lowery, and Roussel) because they ended

> Buyer, and the aggregate Purchase Price and the Deferred Consideration shall be reduced by said amount. The Deferred Consideration due each Seller shall be evidenced by a promissory note of the form attached as Exhibit A, to be delivered to each Seller at Closing (as to each Seller, a "Note" and collectively, the "Note(s)"); each Note shall be payable with interest, compounded monthly at the "Prime" rate as published in the Wall Street Journal, which rate shall be fixed on the Closing Date and adjusted on the 15th day of September, December, March June for the rate as published on said date(s) so long as any balance remains outstanding on the Note(s), and, in the case of Nonexempt Sellers other than Broussard, *shall be conditioned* upon employment of the Seller by Company as of the respective payment due dates. The schedule for the installment payments and the aggregate maximum amount of the installments due under the Notes, less any amount otherwise payable to any Seller whose employment has terminated for the reasons specified in (i) and (ii) above, shall be as follows:
>
> > (1) One Million Dollars ($1,000,000) plus accrued interest payable in cash by wire transfer on January 31, 2009;
> >
> > (2) One Million Dollars ($1,000,000) plus accrued interest payable in cash by wire transfer on January 31, 2010; and
> >
> > (3) One Million Eight Hundred Thousand Dollars ($1,800,000) plus accrued interest payable in cash by wire transfer on January 31, 2011.
>
> The Note(s) shall be secured by a letter of credit in substantially the form attached as Exhibit B (the "Security").
>
> The proportionate Deferred Consideration due under the Note held by each Exempt Seller (as identified on Schedule 1) shall be payable notwithstanding termination of such Seller's employment for any reason; *provided, however, that* the amount of Deferred Consideration payable to any such Exempt Seller whose employment has terminated on or before the due date for payment of any installment thereof, as aforesaid, shall be deducted from Deferred Consideration otherwise due Broussard. The Deferred Consideration evidenced by the Note held by Broussard shall be subject to no conditions, limitations or reductions for any cause other than deductions in respect of payments of Deferred Consideration to Exempt Sellers whose employment has been terminated and otherwise as provided in this Agreement.

(Emphases added).

their employment before the second and third payments were due.

While the parties advance their respective interpretations, there is no dispute that these sections of the SPA contain certain conditions precedent to WCW's performance of paying Shareholders all or even any of the deferred compensation portion of the purchase price.[23] The first condition, applying to Nonexempt Shareholders except Broussard, is that they must still be employed at Spectrum one year after closing unless they resign with good reason to receive any deferred compensation. The second condition, again applying to Nonexempt Shareholders except Broussard, is that they must be employed as of the Note installment due dates to receive those payments. And the third condition, applying to Broussard, is that the Exempt Shareholders must be employed as of the Note installment due dates for him to receive his full amount of deferred consideration.[24] In addition, the Notes themselves state that WCW "is executing and delivering this Promissory Note pursuant to the terms and conditions of" the SPA. The Notes also state: "Payments to Payee of the principal amount of this Promissory Note shall be subject to the provisions of Section 1.2(B) of" the SPA.

Where a contract contains conditions precedent, there must be some allegation by the plaintiff that the conditions have been met. *Grimm v. Grimm*, 864 S.W.2d 160, 161 (Tex. App.—Houston [14th Dist.] 1993, no writ). Performance

---

[23] A condition precedent that affects a party's obligation to perform is an act or event that must occur after the making of a contract before a right to immediate performance arises and before there may be a breach of contractual duty. *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992). Conditional language such as "if," "provided that," or "on condition that" must generally be included in order to make performance specifically conditional. *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 109 (Tex. 2010).

[24] These three conditions precedent are contained in section 1.2B. Section 1.5, consistent with the first two conditions, provides that Nonexempt Shareholders whose employment is terminated due to "Resignation," defined in section 1.2B as "voluntary resignation without Good Reason," forfeit any unpaid deferred consideration as of their termination.

of any condition precedent is an essential element of the plaintiff's case. *Id.* Under rule 54, if a plaintiff pleads generally the performance of conditions precedent, the plaintiff need only prove performance of those conditions specifically denied by the defendant. Tex. R. Civ. P. 54; *Cmty. Bank & Trust, S.S.B. v. Fleck*, 107 S.W.3d 541, 542 (Tex. 2002) (per curiam); *Bencon Mgmt. & Gen. Contracting, Inc. v. Boyer, Inc.*, 178 S.W.3d 198, 203 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Grimm*, 864 S.W.2d at 162. That is, a defendant's general denial that all conditions precedent to a plaintiff's right to recover have been performed is not sufficient under rule 54. *See* Tex. R. Civ. P. 54; *compare Dairyland Cnty. Mut. Ins. Co. of Tex. v. Roman*, 498 S.W.2d 154, 158–599 (Tex. 1973) (allegation that plaintiff failed to comply with conditions of insurance policy accompanied by copy of policy's "conditions" section held not sufficient); *Coastal Terminal Operators v. Essex Crane Rental Corp.*, No. 14–02–00627–CV, 2004 WL 1795355, at *7 (Tex. App.—Houston [14th Dist.] Aug. 12, 2004, pet. denied) (mem. op.) ("[I]t is not sufficient to simply deny that all conditions precedent have been satisfied, even if the word 'specifically' is included in the denial."); *and Kartalis v. Lakeland Plaza Joint Venture*, 784 S.W.2d 64, 67 (Tex. App.—Dallas 1989, writ denied) (allegation "that the Plaintiff has failed to comply with each and every of the provisions of the Agreement and that all conditions precedent necessary to the maintenance of this action and, [sic] has not met all the conditions precedent necessary to the institution of this action" held not sufficient), *with Betty Leavell Realty Co. v. Raggio*, 669 S.W.2d 102, 103–04 (Tex. 1984) (allegation that purchaser failed to obtain financing within 20-day period required by paragraph 17 of contract held sufficiently specific).

Within their breach of contract count for both the SPA and the Notes, Shareholders pleaded that they "fully performed all conditions precedent under the

36

SPA and the Notes." Thus, they were required to prove only the conditions precedent WCW specifically denied. *See* Tex. R. Civ. P. 54, *Bencon Mgmt.*, 178 S.W.3d at 203. WCW and Wilmot's second amended answer does not contain the term "condition precedent," much less any specific denials as to the alleged conditions precedent in sections 1.2B and 1.5 of the SPA asserted by them against certain Shareholders in their fourth issue. In their second amended answer, under affirmative defenses, WCW and Wilmot state: "Defendants assert that Plaintiffs' claims are barred by the terms of the actual relevant documents and Defendants' contractual defenses." They also state: "Defendants assert that Plaintiffs neglected their contractual employment duties, and therefore breached the contracts and agreements." Neither of these statements amounts to a specific denial or allegation that Shareholders failed to comply with the conditions precedent to their right to recover deferred consideration under the SPA and the Notes. Nonetheless, WCW and Wilmot complain on appeal that certain Shareholders failed to satisfy the specific employment conditions precedent to their recovery of deferred consideration, i.e., their payments due under the Notes, and that they failed to obtain findings even if any "good reason" exception to the conditions precedent may apply. However, it was WCW and Wilmot that failed to specifically deny that Shareholders performed these conditions. Under these circumstances, and based on this state of the pleadings, we conclude that Shareholders were not required to prove the specific conditions precedent regarding their employment status and dates under sections 1.2B and 1.5 of the SPA to be able to recover their deferred consideration under the Notes. *See Dairyland*, 498 S.W.2d at 159; *Bencon Mgmt.*, 178 S.W.3d at 205; *Kartalis*, 784 S.W.2d at 67.

We overrule WCW and Wilmot's fourth issue.

37

Because we overrule WCW and Wilmot's first four issues, we do not reach their two remaining issues, which are dependent on reversal of the trial court's judgment. *See* Tex. R. App. P 47.1.

**E. The trial court did not err by not holding Wilmot jointly and severally liable as to WCW's breach.**

In their sole remaining cross-appeal issue, Shareholders argue that the trial court erred by not signing a judgment against Wilmot based on the guaranty because the evidence conclusively shows that he is jointly and severally liable with WCW on the SPA and the Notes. WCW and Wilmot contend that Shareholders waived this issue by moving for the trial court to sign a judgment on the jury's findings—which included a $0.00 damages finding based on Wilmot's breach of the guaranty. Shareholders assert they did not waive the issue where the trial court did not sign their proposed judgment that they "approved as to form," and where they filed a motion to disregard that damages finding and to enter judgment on sums due on the guaranty, which motion the trial court considered and denied.

Assuming without deciding that Shareholders did not waive an appellate attack on the judgment by filing their motion, the record reveals that what Shareholders requested and argued below was not joint and several liability against Wilmot with WCW on the breach of the SPA and the Notes, but rather that the trial court disregard the guaranty damages finding and amend the judgment to reflect damages against Wilmot in the amount of $7.9 million for the sums due on the guaranty ($4.1 million in initial consideration plus the $3.8 million LOC).[25] Shareholders' complaint and request on appeal does not comport with their objection and request below. As such, they have failed to preserve, and thus we

---

[25] While joint and several liability was discussed during the hearing on the entry of judgment, it was in the specific context of the jury's fraud findings against both WCW and Wilmot.

38

overrule, this issue. *See* Tex. R. App. P. 33.1(a); *Wohlfahrt v. Holloway*, 172 S.W.3d 630, 639 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (party waived particular argument on calculation of post-judgment interest in trial court's judgment by making different argument before trial court).

## IV.     CONCLUSION

Accordingly, we affirm the trial court's judgment.


/s/          Marc W. Brown
              Justice

Panel consists of Justices Christopher, Donovan, and Brown.